798 F.2d 882
 Fed. Sec. L. Rep. P 92,863
Asher B. EDELMAN, Plaza Securities Company, a New York
limited partnership, FH Acquisition Corporation, a Michigan
corporation, FH Partners, L.P., a Delaware limited
partnership, and FH Management Corporation, a Delaware
corporation, Plaintiffs-Appellees,
v.
FRUEHAUF CORPORATION, a Michigan corporation, Jack Breslin,
Donald Chamberlin, Frank Coyer, Jr., John Grace, Russell
Howell, John McCabe, Thomas Reghanti, Dean Richardson,
Robert Rowan, Francis Sehn, James Wilkerson, T. Neal Combs,
Leon Alexander and Robert Seifert, Defendants-Appellants.
 No. 86-1652.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 5, 1986.
Aug. 8, 1986.
 
 William M. Saxton, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., Kenneth M. Kramer, argued, Shearman & Sterling, New York City, for defendants-appellants.
 Carl H. von Ende, Gregory L. Curtner, Miller, Canfield, Paddock and Stone, Detroit, Mich., Martin Flumenbaum, argued, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs-appellees.
 W. Merritt Jones, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., William R. Norfolk, William L. Farris, Sullivan & Cromwell, New York City, for amicus curiae.
 Before MERRITT, MARTIN and GUY, Circuit Judges.
 MERRITT, Circuit Judge.
 
 
 1
 In this corporate takeover case arising under the Securities Exchange Act and the Williams Act and under Michigan law governing corporate self-dealing, the District Court issued a preliminary injunction restraining the defendant directors of Fruehauf Corporation, the target corporation, from using corporate funds and from preempting the bidding in order to assist Fruehauf management in effectuating a leveraged buyout made in response to a hostile tender offer by plaintifffs, the Edelman group. The District Court also required the disclosure of certain information to shareholders in connection with management's buyout offer and ordered that the Fruehauf directors establish a fair auction process and reopen the bidding for the company instead of closing it off prematurely by accepting management's bid. It ordered the defendants to give the Edelman group an opportunity to continue the bidding on an equal basis with management. The basic issues before us concern the steps that management and the directors of a target corporation may take in attempting to beat a hostile takeover by formulating a management buyout of the company. The basic question is: once the company has been put up for sale, to what extent should Michigan corporation law be interpreted to require open bidding on an equal basis by all parties including management and to what extent should the law allow the directors of the target corporation to tilt the contest in management's favor. We have conducted an emergency hearing and reviewed the briefs and record and are now in a position to decide on an expedited basis the issues presented.
 
 
 2
 Fruehauf Corporation was incorporated under the laws of Michigan. The company is a leading producer of truck trailers and cargo containers. It owns a finance company and has subsidiaries in a number of industries: auto parts production, conversion of cargo ships to container operations, construction and repair of ships, and manufacture of container handling equipment. In 1985, Fruehauf and its subsidiaries had sales of $2.5 billion and net profit of $70 million. It has over 21 million shares of common stock outstanding, and in 1985, Fruehauf stock traded publicly at between $20.3 and $28.8 per share.
 
 
 3
 In February 1986, the Edelman group began acquiring Fruehauf stock on the open market. At that time, the stock was trading in the mid $20 range. The Edelman group attempted, unsuccessfully, to negotiate a "friendly" acquisition of Fruehauf and then proposed a cash merger in which Fruehauf shareholders would receive $41 per share for their stock. Later, this price was increased to $42 per share. Fruehauf's Board rejected this proposal. On June 11, 1986, the Edelman group announced its intention to make an all-cash tender offer for all Fruehauf shares at $44 per share. Fruehauf's financial advisors told the Board that if the Edelman group made the offer, the shares would probably be tendered. At that time, the Board realized that a change of ownership of Fruehauf was imminent and that the company would end up being sold. The market responded to the Edelman group's overtures, and the market price of Fruehauf stock climbed to the mid $40 range.
 
 
 4
 In response to the Edelman group's offer, members of Fruehauf's management negotiated with Merrill Lynch to arrange a two-tier leveraged buyout by management and Merrill Lynch. Under this deal, a corporation formed for purposes of the buyout would purchase approximately 77% of Fruehauf's stock in a cash tender offer for $48.50 per share. This tender offer would be funded using $375 million borrowed from Merrill Lynch, $375 million borrowed from Manufacturers Hanover, and $100 million contributed by Fruehauf Corporation. Next, Fruehauf would be merged with the acquiring corporation, and the remaining Fruehauf shareholders would receive securities in the new corporation valued at $48.50. Total equity contribution to the new company would be only $25 million dollars--$10 to $15 million from management and the rest from Merrill Lynch. In return for their equity contribution, management would receive between 40 and 60 percent control of the new company (depending on the amount of their equity contribution). Under this arrangement, Fruehauf would also pay approximately $30 million to Merrill Lynch for loan commitment fees, advisory fees, and a "break-up fee" that Merrill Lynch would keep even if the deal did not go through. Additionally, the deal would contain a "no-shop" clause restricting Fruehauf's ability to attempt to negotiate a better deal with another bidder. A special committee composed of Fruehauf's outside directors approved the proposed management leveraged buyout, and Fruehauf's board authorized the buyout. We must determine whether these outside directors and the board as a whole fulfilled their fiduciary duty to Fruehauf's shareholders when they approved management's buyout proposal.
 
 
 5
 Like the District Court, we conclude on the basis of strong evidence that Fruehauf's Board of Directors unreasonably preferred incumbent management in the bidding process--acting without objectivity and requisite loyalty to the corporation. Their actions were not taken in a good faith effort to negotiate the best deal for the shareholders. They acted as interested parties and did not treat the Fruehauf managers and the Edelman group in an even handed way but rather gave their colleagues on the Board, the inside managers, the inside track and accepted their proposal without fostering a real bidding process.
 
 
 6
 The evidence for this conclusion is clear. Several directors admitted their bias in their depositions. In disclosing the management transaction to the stockholders, the Board made it appear that the management proposal was the best bid obtainable after giving Edelman a reasonable opportunity to top the bid. In fact the Board accepted the leverage buyout proposal of the management and Merrill Lynch without giving Edelman an opportunity to bid further and then rejected out of hand Edelman's offer a couple of days later to acquire the company on the same terms as management but at a higher price. While refusing to talk to Edelman or promote an open bidding process, the Board agreed to pay well over $30 million in corporate funds to Merrill Lynch as financing and advisory fees so that the management buyout could be consummated. (Over half of this amount would be paid even if another bidder prevailed.) The Board also made available $100 million of corporate funds for management's use in the purchase of shares and entered into an agreement severely limiting the Board's ability to negotiate another offer.
 
 
 7
 There are other indicia of the Board's intention to preempt the bidding in favor of management. For example, the committee of outside directors employed as its advisor the investment banker that was in the process of negotiating management's buyout proposal and clearly favored that course. Then no effort was made to get a counter offer. Additionally, the Board amended Fruehauf's stock option plan, incentive compensation plan, and pension plan to provide that if anyone obtained a 40% interest in Fruehauf without the Board's approval, all company-issued options in Fruehauf stock would be immediately exercisable, all incentive compensation payments normally due Fruehauf's salaried employees in due course would become immediately due, and the $70 to $100 million of overfunding in the pension plan, which had been available for corporate use, would be irrevocably committed to the pension fund. These measures had the effect of making Fruehauf a less attractive takeover target, and thereby, of dampening the bidding process. Later, in response to the threat of litigation, the Board again amended these plans to provide for acceleration of stock options and incentive compensation payments in the event anyone became a 40% shareholder, even with Board approval. Counsel admits that it is from these plans that members of management would obtain the money for their equity contributions to the management buyout. The Board also further amended the pension plan to give advance board approval to any 40% acquiror who pays at least $48.50 per share. In short, it appears that the Board simply decided to make a deal with management no matter what other bidders might offer. The entire factual pattern is consistent with that purpose.
 
 
 8
 Under Michigan law, a "transaction between a corporation and 1 or more of its directors or officers" is invalid unless the transaction is "fair and reasonable" or is properly authorized or ratified by disinterested directors or shareholders after complete disclosure. Mich.Comp.Laws Sec. 450.1545. "When the validity of [such] a contract ... is questioned, the burden of establishing its validity" is on the Board. Id. at Sec. 450.1546. Michigan law is similar to the general law on this subject. See Radol v. Thomas, 772 F.2d 244, 257 (6th Cir.1985).
 
 
 9
 In this case, the Board has failed to carry its burden of establishing that the management buyout was fair and reasonable in light of the circumstances. The Board argues that the transaction was valid under section 450.1545 because it was authorized by Fruehauf's disinterested directors after complete disclosure. This argument assumes that any authorization by disinterested directors will suffice. However, the Board must also show that the disinterested directors did not act in dereliction of their fiduciary duty to the corporation and its shareholders when they authorized the management buyout. The evidence compels the conclusion that the directors simply "rubber stamped" the management buyout proposal. In so doing, they breached their fiduciary duty. See Hanson Trust PLC v. ML SCM Acquisition, Inc., 781 F.2d 264 (2d Cir.1986), in which the Second Circuit was faced with another leveraged buyout of a takeover target by an investment group composed of Merrill Lynch and members of the target's management. In Hanson, as in this case, the disinterested directors had approved the buyout and later argued that the business judgment rule proscribed judicial inquiry into their decision. Construing New York law, the court rejected the directors' argument, holding:
 
 
 10
 [T]he exercise of fiduciary duties by a corporate board member includes more than avoiding fraud, bad faith and self-dealing. Directors must exercise their "honest judgment in the lawful and legitimate furtherance of corporate purposes." It is not enough that directors merely be disinterested and thus not disposed to self-dealing or other indicia of a breach of the duty of loyalty. Directors are also held to a standard of due care. They must meet this standard with "conscientious fairness." For example, where their "methodologies and procedures" are "so restricted in scope, so shallow in execution, or otherwise so pro forma or halfhearted as to constitute a pretext or sham," then inquiry into their acts is not shielded by the business judgment rule.
 
 
 11
 ... [W]hile directors are protected to the extent that their actions evidence their business judgment, such protection assumes that courts must not reflexively decline to consider the content of their "judgment" and the extent of the information on which it is based.
 
 
 12
 781 F.2d at 274-75 (citations omitted, emphasis in original). The court found that the directors had breached their fiduciary duty. It enjoined a "lock-up option" that was part of the buyout arrangement.
 
 
 13
 Given the Board's unreasonable conduct in violation of Michigan law, as found by the District Court, we agree with the District Court that the remedy should be injunctive relief. All sides agree that Fruehauf is on the auction block. Once it becomes apparent that a takeover target will be acquired by new owners, whether by an alleged "raider" or by a team consisting of management and a "white knight," it becomes the duty of the target's directors to see that the shareholders obtain the best price possible for their stock. "The directors' role change[s] from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 182 (Del.Sup.1986). When, in violation of this duty, directors take measures that are intended to put an end to the bidding, those measures may be enjoined. See Revlon, 506 A.2d at 184 (enjoining directors from agreeing to a "no-shop" clause, which prevented them from negotiating with other bidders). In light of the clear failure of the Board to provide for a fair auction, the District Court was correct to devise injunctive relief setting a framework for an open bidding process.
 
 
 14
 We have asked the parties to structure and submit proposed injunctive orders setting a framework for an open bidding process. They have now done so, and we have taken their submissions and fashioned a modified injunctive order taking into account changes in circumstances since the District Court entered its order, as well as various criticisms of several provisions of its order. This modified injunction is attached as an addendum to this opinion.
 
 
 15
 As Judge Guy pointed out in dissent at the hearing, the most controversial provisions of the District Court's injunction are its provisions restraining the defendants from using corporate funds to effectuate the buyout, including financing, commitment, legal and other similar fees. Our treatment of those provisions should not suggest that under the business judgment rule we would never allow corporate funds to be used to encourage bidders or even to encourage management buyouts. Obviously some marginal costs to finance the flow of information are necessary, and advisory fees for lawyers and investment bankers to structure and conduct the bidding process will have to be paid. It may be that in some instances--where the neutrality and objectivity of the Board is clearly present--commitment fees of various bankers should be paid.
 
 
 16
 But in this case, as the District Court found, the degree of the Board's largesse in favor of the managers, their bankers, and Merrill Lynch, is out of proportion. The Board was willing to make over $130 million available to its managers to insure their success. The evidence clearly suggests that the Board's purpose was not to create a fair bidding process but to make sure that the managers and Merrill Lynch bought the company and that other bidders would be turned away. In light of this conduct, the District Court was correct in restraining the Board from making Fruehauf money available to fund the management buyout. Where evidence of bias is clearly present, an injunction ensuring neutrality is necessary and each bidder must stand on its own bottom in respect to funding.
 
 
 17
 We believe this position is consistent with the development of the law. The original common law rule prohibiting transactions with interested directors was found to be too inflexible and was gradually modified. See Model Business Corp.Act Sec. 41 and accompanying notes (2nd ed. 1971) (stating that such transactions should not be void per se and tracing history of development); W. Cary & M. Eisenberg, Cases and Materials on Corporations 563-74, 613-37 (5th ed. 1980). Vague principles granting deference to managers and directors whose interests clearly conflict with the corporation have not worked well in buyout situations and firm rules ensuring open bidding are considered necessary by most scholars who have investigated the problem. See generally, Lowenstein, Management Buyouts, 85 Colum.L.Rev. 730 (1985).
 
 
 18
 Accordingly, the judgment of the District Court, as modified herein, is affirmed.
 
 
 19
 RALPH B. GUY, Jr., Circuit Judge, dissenting.
 
 
 20
 I dissent because I do not believe the modified temporary injunction entered in this case is consistent with the reasoning of the majority opinion, nor can I accept the methodology used in arriving at the conclusion of either the trial court or this court on appeal.
 
 
 21
 We are presented here with a relatively typical takeover case. Fruehauf, upon becoming aware that a takeover attempt was underway, decided to resist. It is not really clear from the record whether the resistance was for the purpose of forcing a higher tender offer, keeping control of the company, or some combination of both. In any event, Fruehauf went to the now relatively common arsenal of defenses and came forward with the usual assortment of lock-ups, poison pills, and other devices designed to make things more difficult for the raider and easier to find a white knight. The trial court enjoined all of the defensive actions taken by Fruehauf and ordered them rescinded. It also ordered that to the degree corporate funds were going to be used, they must be available to all on an equal basis. On appeal, the majority extends the "available to all" principle even further. For example, unlike the trial court, they have allowed the poison pills to remain so long as everyone has to swallow them.
 
 
 22
 Philosophically, there is a wide divergence of opinion as to the proper role of management in the face of a legitimate takeover attempt. Some urge almost complete passivity on the part of management, while others would allow active resistance and consideration of not only stockholder interests, but such things as employee interests as well.[1] Although the varying philosophies make an interesting backdrop for the decision of this case, we are not free to roam the landscape in the same manner as the commentators. Essentially, courts must look to applicable state and federal statutes, the business judgment rule, and the judicial decisions which offer at least some guidance in this area.
 
 
 23
 It is my feeling that undue weight in the decision making process has been given to the fact that members of Fruehauf management will be part of the white knight group. Although such action may well require close scrutiny, it is certainly not per se illegal or improper. Regardless of how one would characterize management actions here, the fact remains that the net result of that action was to increase the firm offer to shareholders from $44.00 a share to $48.50 a share. I would also note that to the degree shareholders have become a party to this litigation, they have supported, not attacked, what management has done. Unless you adopt the view, which no court has yet done, that management must be totally passive in the face of a takeover, I cannot see where the shareholders have been harmed to date by the action taken by the defendants. My view is not changed on this issue by the fact that plaintiff has offered to "negotiate" a higher offer. However, I am not prepared to hold that management's "cold shoulder" to the offer to negotiate was appropriate either. I just don't think there is a record here on which that decision can be made. It involves an evaluation of the upside benefit of getting perhaps a dollar more per share versus the downside benefit of possibly losing the white knight in the process. The business judgment rule does not require a decision by a court that the actions taken were correct in some absolute or hindsight sense, but only that they be reasonable at the time. At least part of the rationale of the business judgment rule is that managers know more about running their businesses than courts do.
 
 
 24
 Admittedly, these are difficult cases; the surroundings are unfamiliar, the argot is strange, the financial transactions are complex, and the time limit for decision making is extremely short. Nonetheless, in this case we are presented with a clear record as to exactly what steps management took to resist the takeover and find a white knight. The district court reviewed these actions and found them improper, but no reasons are given as to why they are improper or what judicial precedent is being specifically violated. Although all of the actions taken may be pigeonholed by category, e.g., lock up, no-shop provision, the mere affixing of the label does not resolve the question of the propriety or impropriety of the action taken. Revlon, Inc. v. MacAndrews & Forbes Holdings, 506 A.2d 173, 176 (Del.1986). Nothing could illustrate this point better than the majority's allowance of that which the district court ordered rescinded, conditioned only upon an even handedness of application. I cannot subscribe to this reasoning. If what management did was illegal, as the majority opinion concludes, it should be enjoined. If it wasn't illegal, it should be allowed even if philosophically unpalatable and, if a court cannot tell, it seems to me that this is what the business judgment rule is all about and the nod should be given to those who are vested with the business decision making responsibility.
 
 
 25
 I think that what is required here is a careful analysis of each of the alleged wrongful actions taken and a decision as to whether the defendants violated their responsibilities as to each such action. We have spent too much time looking at the chaff and ignored the seed. The plaintiffs have skillfully merchandized such things as the fact that the outside directors did not engage personally in any negotiations with Merrill Lynch or any other party. We are given no authority for the proposition that they must. I do not understand that to be the role of outside directors in a takeover situation. Rather, they are to exercise independent judgment as to the general fairness and reasonableness of the actions contemplated. Here, they knew that the $48.50 offer was $4.50 higher than the existing tender offer; that it was in excess of $20.00 higher than what the stock was trading for prior to the takeover attempt; and that it was in the ballpark as far as being a fair price for shareholders was concerned. The constraints of time alone, coupled with the lack of familiarity of the outside directors with the day-to-day operations of Fruehauf, place practical limits on their function and responsibility.
 
 
 26
 Notwithstanding that time is of the essence, I would remand to the district court for an evidentiary hearing on the actual effect, if any, of the alleged wrongful actions taken by the defendants, and whether such actions violate their duty to the shareholders. I would note in this regard that in the face of all the defensive actions taken by the defendants, the plaintiffs have still aggressively pursued this acquisition. The question has never been answered or even addressed as to whether measures short of those taken by Fruehauf would have resulted in anyone stepping forward to top the original tender offer of $44.00. This is not to suggest that the ends justify the means, however, as the court's responsibility is to call a halt when that line has been crossed that separates improper self dealing from advancing the interest of the shareholders. The majority may be correct in ruling that that line has been crossed here, however, on the state of the record before me, I cannot comfortably join in that conclusion.
 
 INJUNCTIVE ORDER
 
 27
 Plaintiffs in the above-entitled action having filed a motion for preliminary injunction and a memorandum of law in support thereof; and defendants having filed a reply memorandum of law in opposition thereto; and the District Court having conducted, on July 24, 1986, a consolidated hearing on the aforesaid motion and the motion for preliminary injunction filed by the plaintiffs in Civil Action No. 86 CV 72915 DT; and argument having been given on said motions on behalf of all parties to both said actions, including Merrill Lynch & Co., a defendant in Civil Action No. 86 CV 72915 DT; and, due to the urgency imposed by the imminent consummation of the transaction proposed by defendants, the District Court having delivered its opinion, recited its findings of fact and conclusions of law and issued a preliminary injunctive order on the record, in open court, and with counsel for all parties in attendance; and the District Court having concluded that plaintiffs have met all of the criteria entitling them to preliminary injunctive relief; and that the District Court has set forth its preliminary injunctive order in a separate written order, dated July 29, 1986; and the defendants having filed a notice of appeal from the District Court order to this Court of Appeals; and the defendants and plaintiffs having filed memoranda of law and appendices on an expedited basis; and Merrill Lynch & Co. having been granted permission to participate in the appeal as amicus curiae; and the Court of Appeals having heard, on August 5, 1986, oral argument on the appeal by all parties and by Merrill Lynch & Co.; and the Court of Appeals having determined that the order of the District Court should be affirmed, except as expressly modified herein.
 
 IT IS HEREBY ORDERED AS FOLLOWS:
 
 28
 I. The Fruehauf defendants (the "defendants") and those acting in concert with them are enjoined from conducting, furthering, pursuing or concluding the LMC tender offer of June 27, 1986 (the "offer"), except as herein ordered by this Court. This injunction precludes specifically, but without limitation, accepting for payment or rendering payment for any shares tendered in connection with that offer except as ordered.
 
 
 29
 II. In the event that defendants elect to pursue the LMC offer, defendants are ordered to keep withdrawal rights open during the pendency of any offer for Fruehauf.
 
 
 30
 III. In the event that defendants elect to pursue the LMC offer, defendants are ordered to distribute to Fruehauf shareholders, within two business days of the approval thereof by the Court, a supplement of their Offer to Purchase dated June 26, 1986, which includes the following further disclosures:
 
 
 31
 A. A copy of this Court's opinion and this Order, and
 
 
 32
 B. Five year projections of the financial performance of Fruehauf without accounting for the LMC transaction.
 
 
 33
 IV. Defendants and all those in concert with them are enjoined from using, devoting or committing to use any assets of Fruehauf in support of the offer and merger agreement, including specifically but without limitation, the payment or commitment to pay fees of any type or the use of corporate funds or assets to pay for shares acquired or to be acquired by them in connection therewith, or for payment of legal and investment advisors for the Fruehauf defendants, and those acting on concert with them, in connection with any transactions between defendants and those acting in concert with them and the corporation or its shareholders unless the same accommodation is made to all other bidders, as determined by the Board of Directors acting in accordance with their fiduciary obligations.
 
 
 34
 V. Defendants may take action regarding Fruehauf's stock option plans, incentive compensation plans, and retirement plans, in accord with defendants' fiduciary duty, so long as the impact of such actions is equal on all bidders. In assessing the equality of impact on bidders, the defendants need not consider the possibility that members of management may receive benefits from the plans to which they are otherwise entitled.
 
 
 35
 VI. Defendants are further enjoined to rescind their exemption, dated June 24, 1984, of the offer and merger agreement from the provisions of Chapter 7A of the Michigan Business Corporation Act, unless such exemption of the provisions of Chapter 7A is granted to any other bidder offering the highest value to Fruehauf shareholders, as determined by the Board of Directors acting in accordance with their fiduciary obligations.
 
 
 36
 VII. To ensure an open bidding process for Fruehauf, defendants are ordered to refrain from taking any corporate actions which are intended to or have the effect of favoring or advantaging any particular bidder over any other bidder. Defendants are further ordered to make available upon reasonable notice to any potential bidder for Fruehauf all information concerning Fruehauf's business and properties (subject to such bidder agreeing to reasonable provisions to keep such information confidential) and to meet on mutually agreeable and reasonable terms with any potential bidder in good faith. Defendants are enjoined from any further breaches of their fiduciary duties to Fruehauf's shareholders in connection with the contest for control.
 
 
 37
 VIII. It is further ordered that no bond is necessary or appropriate.
 
 
 38
 IX. This order constitutes a modification of the injunctive order issued by the District Court on July 29, 1986. Requests if any for further modification of this order must be initially presented to the District Court.
 
 
 39
 Accordingly, it is so ORDERED.
 
 
 
 [1]
 See, e.g., Esterbrook & Fischel, The Proper Role of a Target Management in Responding to a Tender Offer. 94 Harv.L.Rev. 1161 (1981)