**RESOLUTION TRUST CORPORATION, Plaintiff,**

**v.**

**Frederick H. RAHN; William K. Rahn; Franklin H. Smith; Thomas W. Smith; Richard S. Hennes; Robert H. Durren; and Paul G. Freudenberg, All Jointly and Severally, Defendants.**

No. 1:92:CV:174.

United States District Court, W.D. Michigan.

June 6, 1994.

Richard C. Sanders, Peter A. Metters, Hill Lewis, Detroit, MI, Terry S. Arbit, Resolution Trust Corp., PLS Div., Washington, DC, for plaintiff.

Alfred M. Butzbaugh, Butzbaugh & Dewane, St. Joseph, MI, Paul A. Taglia, Taglia, Fette, Dumke, Passaro & Kahne, St. Joseph, MI, for defendants.

## OPINION

ENSLEN, District Judge.

This matter is before the Court on defendants' motion for dismissal or summary judgment, pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

Plaintiff, Resolution Trust Corporation (RTC), brought suit against seven former directors of Peoples Savings Association of St. Joseph, Michigan (PSA). Two of the defendants have since been dismissed. The suit alleges negligence, gross negligence, breach of fiduciary duty, and breach of contract concerning PSA's investments in various properties in Florida in the 1980s. Plaintiff's standing and rights against the former directors of PSA are derived from the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), particularly 12 U.S.C. §§ 1821(k) and 1821(d)(2)(A).

## FACTS [1]

Resolution Trust Corporation (RTC) was created in 1989, pursuant to 12 U.S.C. § 1441a(b). In March 1989, the Federal Home Loan Bank Board (FHLBB) placed Peoples Savings Association (PSA) in conservatorship. On about February 2, 1990, the Office of Thrift Supervision appointed RTC as receiver for PSA. Therefore, RTC succeeded to all the assets, rights, titles, powers and privileges of PSA, pursuant to 12 U.S.C. §§ 1441a(b)(4) and 1821(d)(2)(A). RTC, in its corporate capacity, then purchased the right to pursue claims against PSA's former officers and directors to recover damages for injuries sustained by PSA.

PSA was originally a Michigan-chartered mutual savings institution. On December 18, 1985, PSA became a federally-chartered savings institution.

[1]. Most of the facts have been taken from plaintiff's complaint. This motion primarily is concerned with preempting the simple negligence standard which plaintiffs contend applies. Consequently, the disposition of this motion is primarily to be determined by this Court's interpretation of FIRREA, which is not dependent on the particular facts of this case.

According to defendants, PSA had endured four years of substantial losses beginning in 1981, as had many other savings and loans due, in part, to increases in interest rates that had occurred since 1979. Changes in federal banking laws between 1978 and 1982 permitted savings and loan institutions such as PSA to invest more in land development, construction, and education, removed geographic restrictions on acquisition, development and construction (ADC) projects, and allowed a higher percentage of assets in such ADC projects.

In 1984, according to defendants, a Business Plan was formally adopted by PSA which included a commitment of 30% of PSA's assets to construction loans, including loans in Florida. In 1983 and 1984, PSA's directors authorized five ADC loans on condominium projects in Florida. The Florida loans had the same basic pattern: PSA formed a subsidiary service corporation for each of the loans which entered into a joint venture partnership with either a real estate developer or an affiliate of the developer. The PSA subsidiary obtained loans from PSA for initial land acquisition and for the development of condominium projects. The developers put up little or no money.

RTC claims that the defendants, who controlled the Board of Directors of PSA and voted for each of the five Florida loan projects that are the basis of this suit, breached the various duties they owed PSA.

### Standard for Summary Judgment

If matters outside the pleadings are presented to and considered by the Court in the context of a motion to dismiss pursuant to Rule 12(b)(6), "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b). Here, various exhibits have been submitted by the parties and reviewed by the Court. Therefore, the motion will be treated as requesting summary judgment, as was alternatively sought in the motion.

■ In reviewing a motion for summary judgment pursuant to Rule 56, this Court should only consider the narrow questions of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). On a Rule 56 motion, the Court cannot resolve issues of fact, but is empowered to determine only whether there are issues in dispute to be decided in a trial on the merits. *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987); *In re Atlas Concrete Pipe, Inc.*, 668 F.2d 905, 908 (6th Cir. 1982).

The crux of the motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir.1989).

A motion for summary judgment requires this Court to view " 'inferences to be drawn from the underlying facts ... in the light most favorable to the party opposing the motion.' " *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)), *quoted in Historic Preservation Guild v. Burnley*, 896 F.2d 985, 993 (6th Cir.1989). On the other hand, the opponent has the burden to show that a "rational trier of fact [could] find for the non-moving party [or] that there is a *genuine issue for trial.*' " *Historic Preservation*, 896 F.2d at 993 (quoting *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356).

■ As the Sixth Circuit has recognized and consistently emphasized, recent Supreme Court decisions encourage the granting of summary judgments where there are no material facts in dispute. *Historic Preservation*, 896 F.2d at 993 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The courts have noted that the summary judgment motion may be an "appropriate avenue for the 'just, speedy and inexpensive determination' of a matter." *Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869

F.2d 934, 937 (6th Cir.1989) (quoting *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555). Consistent with the concern for judicial economy, "the mere existence of a scintilla of evidence in support of the [non-moving party's] positions will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. "Mere allegations do not suffice." *Cloverdale*, 869 F.2d at 937. "[T]he party with the burden of proof at trial is obligated to provide concrete evidence supporting its claims and establishing the existence of a genuine issue of fact." *Id.*

## DISCUSSION

Defendants base their motion on three primary grounds: Counts 1, 3, and 4 are based on a claim of simple negligence and such a standard is preempted by federal law; Count 2, which alleges gross negligence, has not been supported by evidence or even allegations sufficient to establish this claim, as defined under Michigan law; and the Business Judgment Rule, under Michigan law, insulates defendants' business decisions concerning Peoples Savings Association (PSA) in a manner that precludes the claims made by plaintiff Resolution Trust Corporation (RTC).

### Counts 1, 3, and 4: Applicability of Negligence Standard

Count 1 alleges that the defendants were negligent in their approval of the Florida loans and in their administration of those loans. Count 3 alleges that the defendants breached their fiduciary duty to PSA. Similarly, Count 4 alleges that defendants failed to use due care in performing their duties as outside directors of PSA, which is alleged to constitute breach of contract. I agree with defendants that all three of these claims relate to a claim of negligence.[2]

Defendants contend that section 1821(k) establishes a national standard that requires the RTC to show gross negligence or worse conduct on the part of the directors in order to hold them liable. RTC claims, as it has in many cases, that while section 1821(k) permits the RTC to sue on the basis of gross negligence or worse conduct, it expressly does not limit the RTC's rights if other laws, including state common law, permit liability to be imposed against former directors on the basis of simple negligence.

Whether section 1821(k) preempts liability to the Federal Deposit Insurance Corporation (FDIC) or RTC for breaching a higher level of care, such as simple negligence, has been disputed in many cases during the past four years, including the Seventh, Ninth, and Tenth Circuits. The Sixth Circuit, in dicta, also has made a statement on the issue.[3]

While some courts have held that the RTC or FDIC is limited to the gross negligence standard and cannot also seek liability under state law or under other federal law against directors and officers. Others have held that the language, purpose, and legislative history of FIRREA, including section 1821(k), does not limit the rights of the FDIC that it may have under "other applicable law," including state laws permitting liability to be based on simple negligence.[4] Although it is likely that the Supreme Court will ultimately resolve this question, certiorari has not yet been granted in any cases.

Section 1821(k) provides as follows:

2. Defendants have not contended that the alleged breach of contract is not cognizable as a contract claim or that the breach of fiduciary duty is simply duplicative of the negligence claim and should be dismissed for simplicity. *See F.D.I.C. v. Mintz*, 816 F.Supp. 1541 (S.D.Fla.1993). Consequently, the survival of Counts 3 and 4 follows the disposition of the issue as to Count 1, which alleges negligence.

3. *Resolution Trust Corp. v. Gallagher*, 10 F.3d 416 (7th Cir.1993) (holding preemption of federal common law, with dicta indicating preemption of state law as well); *F.D.I.C. v. McSweeney*, 976 F.2d 532 (9th Cir.1992) (holding no preemption of state laws that extend liability to include simple negligence); *F.D.I.C. v. Canfield*, 967 F.2d

443 (10th Cir.1992) (same); *Gaff v. F.D.I.C.*, 919 F.2d 384 (6th Cir.1990) (stating that liability of bank officers and directors is determined by federal law, pursuant to § 1821(k) and such was persuasive authority for holding that federal common law rather than state common law was applicable in determining the ownership, priority, and adjustment of claims by stockholders of a bank after the F.D.I.C. takes over an insolvent national bank).

4. *See* David B. Fischer, Comment, *Bank Director Liability Under FIRREA: A New Defense for Directors and Officers of Insolvent Depository Institutions—or a Tighter Noose?*, 39 U.C.L.A. L.Rev. 1703, 1776 (1992).

A director or officer of an insured depository institution *may be* held personally liable for monetary damages in any civil action by, on behalf of, or at the request or direction of the [FDIC], which action is prosecuted wholly or partially for the benefit of the Corporation—

\*  \*  \*  \*  \*  \*

(2) acting based upon a suit, claim, or cause of action purchased from, assigned by, or otherwise conveyed by such receiver or conservator, ...

\*  \*  \*  \*  \*  \*

for gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct, as such terms are defined and determined under applicable State law. *Nothing in this paragraph shall impair or affect any right of the [FDIC] under other applicable law.*

12 U.S.C. § 1821(k) (emphasis added).

RTC was appointed as receiver for PSA in February 1990, about a year after the Federal Home Loan Bank Board declared PSA to be insolvent and appointed the FSLIC as conservator. RTC, in its corporate capacity, purchased from RTC, the receiver, the right to pursue claims against the former directors and officers of PSA. It contends that the former directors were negligent in their approving and administering of five PSA loans concerning land developments in Florida.

Three of the four counts are based upon an allegation that the defendants were simply negligent, that is, they breached a duty of care. The remaining count contends that the same facts underlying the other three counts also support finding gross negligence, as recently construed in Michigan.

Finally, because PSA converted from being a Michigan-chartered institution to being federally-chartered on December 18, 1985, RTC contends that both federal and state common law concerning the liability of bank directors are implicated. All of the loans had been approved prior to the conversions. However,

some of the administrative responsibilities of PSA and its directors continued after the conversion occurred.

### Section 1821(k) Preemption

The Sixth Circuit, in 1990, in holding that federal common law rather than state common law applied in making determinations about ownership and priority claims of stockholders against a bank and its directors after the FDIC had taken over the insolvent bank, applied a three-part test established by the Supreme Court. *Gaff v. F.D.I.C.,* 919 F.2d 384, 388–90 (6th Cir.1990). The Sixth Circuit then noted that its decision to apply federal law was supported by three sections of FIRREA: 12 U.S.C. §§ 1821(d)(2)(A)(i), 1821(g), and 1821(k). *Id.* at 390–91. Regarding section 1821(k) the Sixth Circuit stated:

Congress has clearly indicated that the liability of officers and directors of a bank are determined under federal law.... The legislative history of [§ 1821(k)] explicitly states an intent to nationalize the law of directors' and officers' liability when banks are taken over by the FDIC.

*Id.* at 391 (citing H.R. Conf. Rep. No. 222, 101st Cong., 1st Sess. 398 (1989), *reprinted in* 1989 U.S.Code Cong. & Admin.News 86, 432, 437).

The Sixth Circuit's statements concerning section 1821(k) were merely noted to help support the decision to use federal common law. Section 1821(k) was not at issue in the case, and there is no indication that the court considered the various arguments against preemption that the RTC has cited in this case. Consequently, I do not interpret the Sixth Circuit's comments on section 1821(k) as being binding on this Court or to be deserving of any significant deference. *See United States v. Doherty,* 969 F.2d 425 (7th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 607, 121 L.Ed.2d 542 (1993).[5]

### Federal Common Law [6]

RTC contends that some of the alleged negligent acts by defendants occurred after

---

**5.** Plaintiff has not suggested that this Court is bound by the Sixth Circuit's dicta in *Gaff.*

**6.** Defendants assert that Peter Metters, attorney for RTC, represented to defendants that the RTC's claim was based solely on Michigan com-

December 1985 when PSA converted to being a federally-chartered savings institution. Therefore, the claims against defendants based upon acts after December 1985 are determined by federal law. As to these claims, the issue is whether section 1821(k) preserved the federal common law actions as well.

Only one appellate court has considered whether there is no preemption of federal common law by section 1821(k). *Resolution Trust Corp. v. Gallagher*, 10 F.3d 416 (7th Cir.1993). That court found that "Congress intended to pre-empt federal common law and establish a gross negligence standard of liability for officers and directors of failed federally chartered financial institutions." *Id.* at 424.

"Where Congress has 'spoke[n] directly to a question' previously addressed by federal common law, Congress need not 'affirmatively proscribe[ ] the use of federal common law' in order for the new scheme to displace it." *F.D.I.C. v. Gonzalez–Gorrondona*, 833 F.Supp. 1545, 1552 (S.D.Fla.1993) (quoting *Milwaukee v. Illinois*, 451 U.S. 304, 315, 101 S.Ct. 1784, 1791, 68 L.Ed.2d 114 (1981)). The need for the " 'unusual exercise of lawmaking by federal courts disappears.' " *Id.* (quoting *Milwaukee*, 451 U.S. at 314, 101 S.Ct. at 1791). The issue is " 'whether the scheme established by Congress addresses the problem formerly governed by federal common law.' " *Id.* (quoting *Milwaukee*, 451 U.S. at 315 n. 8, 101 S.Ct. at 1792 n. 8).

Prior to enacting section 1821(k), "Congress had not legislated on the scope of claims brought by the FDIC against directors and officers of failed savings and loan associations." *Id.* at 1553. This section provides for a gross negligence standard of liability at least as a minimum. *Gallagher*, 10 F.3d at 420. Consequently, section 1821(k) " 'spoke directly' to the issue of what standard of liability governs suits brought by the RTC against officers and directors of failed federally chartered financial institutions." *Id.* at 419.

If Congress wanted a simple negligence standard to apply against federally-chartered institutions' directors, then this statutory section was the appropriate place to establish such liability. The initial Senate version of the bill would have established a negligence liability standard. *F.D.I.C. v. McSweeney*, 976 F.2d 532, 540 (9th Cir.1992). An amendment "omitted the negligence standard and scaled back the preemption." *Id.*

While concerns about states' rights may have resulted in permitting states to expand the scope of liability against directors, see *infra*, there is no similar concern at the federal level. *See Gallagher*, 10 F.3d at 424. Congress for the first time legislated on the liability standard for federally-chartered institutions and established the gross negligence standard, not simple negligence. In light of this legislation, I believe the federal common law on the standard for holding directors monetarily liable was displaced or preempted by section 1821(k).

*State Common Law*

■ Although this Court finds that federal common law was preempted by the gross negligence liability standard established in section 1821(k), "greater evidence is required to preempt state law than federal common law." *Gallagher*, 10 F.3d at 424. In deciding whether to preempt state law, a court must start with the " 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Id.* (quoting *Milwaukee*, 451 U.S. at 316–17, 101 S.Ct. at 1792).

The concerns about protecting the diffusion of power embraced by a federal system that relate to preempting state law " 'are not implicated in the same fashion when the question is whether federal statutory or federal common law governs, and accordingly the same sort of evidence of clear and manifest purpose is not required." *Id.* (quoting *Milwaukee*, 451 U.S. at 316–17, 101 S.Ct. at 1792).

mon law. However, the only evidence of this representation is a letter from defendants. There is no admission from plaintiff and no affidavit

from anyone. Therefore, the merits of whether the claim can be maintained will be considered.

Michigan has codified the duty of care and provides that "a director or an officer shall discharge his or her duties ... (a) in good faith; (b) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (c) in a manner he or she reasonably believes to be in the best interests of the corporation. Mich. Comp. Laws § 450.1541a(1) (a similarly worded standard existed prior to 1989). "This provision makes officers and directors of a Michigan liable for 'ordinary neglect.'" *Estate of Detwiler v. Offenbecher,* 728 F.Supp. 103, 148 (S.D.N.Y.1989) (string citations to Michigan court opinions omitted).

The Michigan standard appears to hold officers and directors liable for less culpable conduct than the gross negligence standard provided under section 1821(k). Therefore, I must determine whether section 1821(k) preempts the state's standard.

The "goal in construing a statute is to ascertain the intent of Congress in order to give effect to its legislative will." *F.D.I.C. v. McSweeney,* 976 F.2d 532, 537 (9th Cir.1992). The proper starting point is "with the language of the statute itself, looking not only to the disputed provision, but also 'to the provisions of the whole law, and to its object and policy.'" *Id.* (quoting *Dole v. United Steelworkers of America,* 494 U.S. 26, 35, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990)).

The purposes of FIRREA include "strengthening the enforcement powers of Federal regulators of depository institutions" and "strengthening the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors." *Id.* (citing Pub.L. No. 101–73, § 101(9), (10), 103 Stat. 183, 187 (1989)). The "construction of § 1821(k) must accord with this statement of general congressional intent." *Id.*

Defendants contend that the first sentence of section 1821(k) establishes a gross negligence liability standard concerning the liability of savings and loan directors to the FDIC or the RTC that preempts state law standards whether they are more or less lenient on these directors. However, "the words

used in section 1821(k) to describe the potential liability of officers and directors belie the creation of an exclusive federal liability standard." *F.D.I.C. v. Canfield,* 967 F.2d 443, 446 (10th Cir.1992) (en banc).

The first sentence of section 1821(k) provides that a "director or officer *may* be held personally liable for monetary damages ... for gross negligence." *Id.* "May" is a permissive term that does not imply anything other than discretionary power. *Id.* (citing *Rose v. Rose,* 481 U.S. 619, 626–27, 107 S.Ct. 2029, 2034, 95 L.Ed.2d 599 (1987)).

"The original Senate version of FIRREA provided that 'notwithstanding any provision of State law, a director or officer ... may be held liable ... for any cause of action available at common law, including but not limited to [ ] negligence [and] gross negligence....'" Jon Shepard, Note, *The Liability of Officers and Directors Under the Financial Institutions Reform, Recovery and Enforcement Act of 1989,* 90 Mich.L.Rev. 1119, 1127 (1992) (quoting S. 774, 101st Cong., § 214(n) (1989)) (hereinafter Shepard).

The managers of the bill successfully amended this provision as follows: a director or officer ... may be held liable for suits brought by the FDIC 'for gross negligence or intentional tortious conduct, as those terms are defined and determined under applicable state law. Nothing in this paragraph shall impair or affect any right, if any, of the [FDIC] that may have existed immediately prior to the enactment of the FIRRE Act.'" *Id.* (quoting 135 Cong.Rec. S4318 (daily ed. Apr. 19, 1989)).

Prior to the Senate's passing of its amended version of section 1821(k), Sen. Riegle, the floor manager of the bill, noted that the manager's amendment "scale[d] back the scope of federal preemption" and "State law would be overruled only to the extent that it forbids the FDIC to bring suit based on 'gross negligence' or an 'intentional tort.'" *Id.* (quoting 135 Cong.Rec. S4278–79 (daily ed. April 19, 1989) (Statement of Sen. Riegle)).[7]

---

7. Sen. Riegle also participated in writing a sec-

tion-by section analysis of the Senate's version of

The final version of section 1821(k), which came out of a House and Senate Conference Committed, altered the Senate version by stating: "Nothing in this paragraph shall impair or affect any right of the [FDIC] *under other applicable law.*" 12 U.S.C. § 1821(k). This "savings clause" has been the source of much of the litigation regarding section 1821(k).

There is no legislative history, such as the Conference Report, to indicate that the re-wording of section 1821(k) represented a substantive change from the original versions of the section that had been approved by the Senate. Shepard, at 1131. This is particularly notable because the Conference Committee specifically stated that "the differences between the House bill ... and the substitute agreed to in conference are noted below, except for clerical corrections, conforming changes made necessary by agreements reached by the conferees, and minor drafting and clarifying changes." H.R. Conf. Rep. No. 222, 101st Cong., 1st Sess. 393 (1989, *reprinted in* 1989 U.S.Code Cong. & Admin.News 432).

I believe that the manager's amendment needed a clarification. It stated that nothing in 1821(k) would impair FDIC's rights that may have existed *immediately prior* to the passage of the act. Had this language been enacted into law, then if a state subsequently changed its law to permit suits for simple negligence against bank directors, the "right" would not have existed *prior to* the passage of FIRREA, and, arguably, would not have been protected. The language that was finally enacted stated that "nothing shall impair ... any right of the [FDIC] *under other applicable law.*" 12 U.S.C. § 1821(k). This change in language clarifies that the savings clause was not limited to only rights that existed at the time of the passage of FIRREA.

Some courts have opined that the savings clause was drafted "to preserve the RTC's ability to take other regulatory actions based on simple negligence," such as preserving the RTC's power to remove directors for simple negligence and to issue cease and desist orders on the basis of a simple negligence standard. *Gallagher,* 10 F.3d at 420–21. However, other courts have noted that "FIRREA was enacted at a time when numerous state legislatures had moved to insulate corporate officers and directors from liability." *McSweeney,* 976 F.2d at 539; *Canfield,* 967 F.2d at 445 n. 2, 448 n. 6 (citing 135 Cong. Rec. S4278–79 (daily ed. April 19, 1989) (statement of Sen. Riegle)). Section 1821(k)'s gross negligence standard was forced to preempt these insulating statutes, thus serving "FIRREA's purpose by strengthening the FDIC's enforcement powers and the civil sanctions available to it." *McSweeney,* 976 F.2d at 540.

I reject *Gallagher*'s limited reading of the savings clause. First, I can find no legislative history, and none has been cited in the cases, law review articles, or by the parties, to indicate that any legislator voiced a concern that section 1821(k) might be construed as impairing or affecting the rights of the RTC under other federal statutory provisions.

Secondly, one of the underlying premises on which the limited interpretation of the savings clause lies is the interpretation of the section as establishing a uniform, national standard of liability. *F.D.I.C. v. Canfield,* 763 F.Supp. 533, 539 (D.Utah 1991), *rev'd,* 967 F.2d 443 (10th Cir.1992). Some senators expressed the belief that the manager's amendment to the bill which removed the language of section 1821(k) providing for personal liability for simple negligence was "essential if we are to attract qualified officers and directors to serve in our financial institutions." 135 Cong.Rec. S4276 (daily ed. April 19, 1989) (statement of Sen. Sanford).

FIRREA which restated this position and added other stronger language. S.Rep. No. 19, 101st Cong., 1st Sess. 318 (1989). However, "the Senate report was not published until two months after the Senate initially voted ... [and], consequently, it is not entitled to substantial weight." *Gallagher,* 10 F.3d at 421 (citing *Clarke v. Securi-*

*ties Indus. Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987)).* It is worth noting that the report was available prior to the voting on the final version of FIRREA, but I will not rely upon the report as being definitive of the Senate's intent.

However, Sen. Sanford further noted that the insulating statutes passed by some states "were enacted largely in response to problems faced by corporations in attracting good officers and directors." *Id.* In fact, he stated his "fundamental belie[f] that issues of corporate governance and the standard of care to which corporate officers and directors should be held are matters of State law, not Federal law" and supported the fact that the "preemption permitted by this [amendment to the] bill is limited solely to those institutions that have Federal deposit insurance and to those cases in which the directors or officers have committed intentional torts or acts of gross negligence." *Id.* at S4277.

I believe that the remarks of Sen. Sanford, who was not a sponsor of the bill, are best understood to indicate his concern that the original version of the bill was trumping the efforts on the part of various states to insulate directors and officers of some risks of liability in order enable corporations to attract better directors and officers. I do not perceive that he was suggesting that states should be precluded from imposing a simple negligence standard of liability. Rather, he appears to have been concerned with the federal intrusion on states' powers concerning director and officer liability.[8]

The House Conference Report stated that "Title II preempts State law with respect to claims brought by the FDIC in any capcity (sic) against officers or directors of an insured depository institution. The preemption allows the FDIC to pursue claims for gross negligence or any conduct that demonstrates a greater disregard of a duty of care, including intentional tortious conduct." H.R.Conf.Rep. No. 222, 101st Cong., 1st Sess. 398 (1989, *reprinted in* 1989 U.S.Code Cong. & Admin.News 432).

"In this case, the explicit preemptive language moves in only one direction and its scope is explicitly limited. The statute blocks only those state laws that require more than gross negligence in order to establish the personal liability of directors and officers. By saving 'other applicable law,' the statute makes unreasonable any inference that the entire field was the target of the legislation." *Canfield,* 967 F.2d at 448; *see also, Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991) (holding that field preemption cannot be inferred unless the federal scheme was so pervasive as to leave no room for the States to supplement it).

The national standard theory is undermined also because even had the gross negligence standard preempted simple negligence standards imposed by some states, it would not have been a single standard. Section 1821(k) contains no federal definition of "gross negligence," instead referring to state law for the definition to be used in a given case. *Canfield,* 967 F.2d at 447. "[T]here is ... no generally accepted meaning of gross negligence." *Id.* (quoting W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 34, at 212 (5th ed. 1984)). Therefore, no true national standard was created even with respect to "gross negligence."

Thirdly, section 1821(k) concerns solely FDIC's rights with regard to holding directors and officers personally liable for their acts or inactions. There was no need to include a savings clause solely to clarify that its reference to using a "gross negligence" federal liability standard in this context did not apply to other statutory provisions that did not concern the standard for personal liability, but concerned when cease and desist orders could be issued and when directors could be removed. If this clarification is all that the savings clause accomplished, then it served no legitimate purpose. "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Id.* (quoting 2A N. Singer, *Sutherland Statutory Construction* § 46.06).

Finally, beyond the explicit right of the FDIC and the RTC under section 1821(k), RTC, as receiver, succeeded to "all rights, titles, powers, and privileges of the insured

---

8. Sen. Heflin also indicated some concerns about provisions of FIRREA that might inhibit attracting "strong and capable individuals as directors and officers." He expressly limited his concerns to Title IX of the bill, and he did not mention Title II, which contains section 1821(k). 135 Cong.Rec. S4264 (daily ed. April 19, 1989) (statements of Sen. Heflin).

depository institution...." 12 U.S.C. § 1821(d)(2)(A)(i). If the FDIC is limited to a gross negligence standard in a state that permits liability for simple negligence, an absurd result could occur. While directors could be personally liable for simple negligence before the failure of the institution; after failure and the FDIC takes over as a receiver, according to the defendants' position, the directors could be personally liable only for gross negligence or more culpable conduct. *McSweeney*, 976 F.2d at 540. Such a construction "would indirectly encourage officials to hasten the demise of the troubled thrift, contrary to the clear intent of Congress 'to curtail ... activities of savings associations that pose unacceptable risks to the Federal deposit insurance funds.'" *Canfield*, 967 F.2d at 449 (quoting FIRREA, Pub.L. No. 101–73, § 101(3), 103 Stat. 183, 187 (1989)).

The first sentence of section 1821(k) states that directors may be held liable for gross negligence or more culpable conduct. "In states where an officer or director is liable for simple negligence, however, the FDIC may rely, as it does in this case, on state law to enable its action." *Canfield* 967 F.2d at 446. "The last sentence of the statute cements [this] understanding of it." *Id.* "Other applicable law" must mean that "any other law providing that an officer or director may be held liable for simple negligence survives," as a different interpretation would result in FDIC's rights in seeking to hold directors monetarily liable would be impaired by section 1821(k) contrary to its plain language and probable intent. *Id.*

Finally, I note that the above interpretation of section 1821(k) gives effect to both sentences in the section. Sentence 1 establishes that officers and directors may be held liable for gross negligence or more culpable conduct regardless of whether certain state laws may previously have insulated officers and directors to a greater degree. Sentence 2 clarifies that the preemption of state law goes only one direction; that is, it only applies with respect to laws that are more lenient on officers and directors and does not affect state laws that are intended to extend

liability to conduct less culpable than gross negligence.

I am unpersuaded that there is enough evidence to indicate that Congress intended section 1821(k) to preempt state law. *See Milwaukee*, 451 U.S. at 316–17, 101 S.Ct. at 1792. The language of the statute itself, the purposes of the statute, the context of the passage of the statute, and the legislative history, as described above, are more consistent with the contrary conclusion that the FDIC and RTC's rights under state laws were not impaired or preempted by section 1821(k). Consequently, I hold that the negligence claim under state law is not precluded by section 1821(k). Similarly, Counts 3 and 4, alleging breach of fiduciary duty and breach of contract premised upon alleged negligent performance, are not precluded under this section.

**Business Judgment Rule**

■ Defendants contend that even if Michigan common law applies, they are insulated from liability by the Business Judgment Rule under Michigan law because there has been no proof of fraud, bad faith, or abuse of discretion.

"If the board of directors is disinterested, has acted in good faith and with due care, its decision in the absence of an abuse of discretion will be upheld as a proper exercise of business judgment." *Priddy v. Edelman*, 883 F.2d 438 (6th Cir.1989) (quoting *Unocal Corp. v. Mesa Petroleum Corp.* 493 A.2d 946, 957 (Del.1985)).

Irrespective of the business judgment rule, directors are "held to a standard of due care. They must meet this standard with 'conscientious fairness.' For example, where their 'methodologies and procedures' are 'restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham, then inquiry into their acts is not shielded by the business judgment rule.'" *Edelman v. Fruehauf Corp.*, 798 F.2d 882, 886 (6th Cir.1986) (quoting *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 274–75 (2nd Cir. 1986)).

"To enjoy the business judgment rule's protection, officers and directors must act

with due care. They meet this requirement if they inform themselves 'of all material information reasonably available to them' prior to making a business decision." *Estate of Detwiler v. Offenbecher*, 728 F.Supp. at 150 (S.D.N.Y.1989) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984)). However, "in fulfilling their duty to inform themselves, officers and directors are entitled to rely on the advice of financial and legal advisors" whom they reasonably believe to be reliable and competent in the matters presented. *Id.* (citing Mich.Comp.Laws § 450.1541a(2)). "Just how much information prudence requires before a decision is made is itself a question that calls for an informed judgment of the kind courts are ill-equipped to make." *Id.*

RTC alleges and provides expert opinion [9] to support finding that defendants did not undertake the necessary effort to ensure that they were sufficiently informed prior to making the investment decisions. It alleges that defendants failed to get at least a rudimentary understanding of the condominium investment business as it existed in Florida. It alleges that they failed to perform reasonably necessary monitoring of their investments in Florida. As stated by Steven Butler, RTC's expert, each of the five Florida investment projects involved actions or inactions by defendants that could be considered to have violated the due care required by their fiduciary duties. Some of this evidence is discussed below.

Regarding Sutherland Crossing, there is evidence that even though the sales volumes and prices were significantly lower than projected, a month before PSA bought its interest in the project, defendants did not require a comparison of actual to projected sales of units or an analysis of the effect of increased finance costs due to sales being slower than projected. They failed to obtain an updated appraisal prior to purchasing the participation.

Concerning Forest Park, defendants did not perform a feasibility analysis or even require any condominium sales prior to closing the loan. They closed on the loan before receiving a narrative appraisal received of the project, having received only a letter appraisal of the project. The narrative appraisal received after closing the loan utilized only a cost-based approach and failed to provide market and income approaches or explain why such approaches were not used. The appraisal lacked a projected sellout period and PSA lacked an estimate of the project's present value at the time of the loan. Defendants allowed PSA to continue to fund construction costs between 1985 and early 1987 without obtaining updated appraisals.

PSA disbursed funds for the Marina Towers project without preparing a detailed listing of the costs associated with the project, and additional loans of nearly $700,000 beyond the original $3,000,000 were provided due to cost overruns. The appraisal relied upon lacked a sales history for the subject property. The appraisal failed to reflect actual sales transactions of completed properties that were deemed to be comparables.

With respect to The Gables project, PSA failed to properly calculate a loan to value ratio using discounted market value, rather than an undiscounted value. The proper ratio would have indicated a significantly increased risk exposure. PSA did not require presale agreements, thereby precluding it from determining if a market existed for the subject units prior to closing the loan. Though construction was not to begin until 7 of the 21 unites had been sold, pursuant to the loan contract, defendants allowed construction to begin after only one of the units had been sold.

Finally, concerning Highlands/Shorewalk, PSA's joint venture partner CCP Bradenton, Inc. had little experience in the Florida real estate market, yet the Joint Venture Agreement was structured such that CCP was to share half the profits without assuming any

---

9. Defendants challenge the sufficiency and admissibility of the factual findings and conclusions of RTC's expert, Steven Butler. However, the findings and conclusions were apparently based upon a review of documents in PSA's files, including, among other things, minutes of Board meetings, independent audit reports, loan underwriting and closing documents, and FDIC examination reports. I do not find that the factual conclusions and expert opinions of Mr. Butler are inadmissible or necessarily insufficient.

significant liability. The appraisal relied upon by PSA failed to provide a cost approach, thus precluding a proper evaluation of the projects feasibility or the effective loan to value ratio. The absorption rate used was based on reservations and not actual sales; therefore, a much lower rate should have been used and it would have significantly reduced the appraised value of the project. The design of the condominiums was changed several times during the course of the project and delays were caused, in part, by a lack of a specific plan for the project.

The above facts and conclusions from Mr. Butler sufficiently indicate that a question of fact remains concerning whether defendants fulfilled their fiduciary duty and duty of due care and were being appropriately informed of the types of information needed to make reasonable investment decisions.

I find that the business judgment rule, under Michigan law, does not protect defendants from these sorts of alleged deficiencies. Further, I do not believe that this Court is substituting its judgment for that of PSA's Board of Directors in expecting defendants to exercise due care in becoming informed about PSA's investments in Florida and staying informed about them prior to sinking significant funds into those projects. Exactly how informed defendants should have been, given reliance on various appraisers and real estate attorneys, is, to an extent, a question of fact for the jury. Clearly, they could not blindly accept the conclusions of these outside sources.

Defendants complain that RTC has not provided sufficient evidence that the alleged deficiencies caused financial harm to PSA. However, I believe that a genuine issue of fact has been established concerning the underwriting and administration of the Florida investments and that significant monetary losses might have been avoided had defendants acted more prudently.

Consequently, Counts 1, 3, and 4 survive summary judgment to the extent that they relate to defendants' actions when PSA was a state-chartered institution.

### Count 2: Gross Negligence

▮ RTC claims that the conduct of defendants also constitutes gross negligence, as that claim is currently handled under Michigan law. Section 1821(k), as noted above, expressly provides that directors may be held liable for "gross negligence," as that phrase is defined by state law. This claim is particularly important with respect to claims concerning defendants' actions following PSA's conversion to being federally-chartered in late 1985 as section 1821(k), as noted above, establishes gross negligence as the federal liability standard.

RTC asserts that gross negligence has been merged with simple negligence under Michigan law. RTC cites a state appellate court case for the proposition that Michigan no longer differentiates between degrees of negligence. *See Vining v. City of Detroit,* 162 Mich.App. 720, 727–28, 413 N.W.2d 486 (1987).

I agree with defendants that *Vining* did not erase the prior definitions of gross negligence made by the Michigan courts. *Vining* merely held that "with the advent of the doctrine of comparative negligence it is no longer necessary in common-law negligence actions to delineate whether the unintentional conduct of a defendant is negligent, grossly negligent, or wilful or wanton. Compensation for damages, where conduct is unintentional, should be apportioned according to fault." *Id.* at 728, 413 N.W.2d 486.

I interpret *Vining* to hold merely that there is no need to differentiate gross negligence from simple negligence in determining comparative negligence and apportioning damages. It did not redefine gross negligence as being the same as negligence.

In *Nationwide Mutual Fire Ins. Co. v. Detroit Edison Co.,* the Michigan Court of Appeals gave a common law definition of "gross negligence" as follows:

> 'To the extent that the term gross negligence does survive, however, it is often described as a 'failure to exercise even that care which a careless person would use.' Prosser [Torts (4th ed.), § 34], *supra,* 183. In the instant case, we believe that by the term 'gross neglect,' the parties intended some form of negligence greater than ordinary negligence, but less than conduct bordering on deliberateness. Therefore, we conclude that for purposes of this lease,

when the parties employed the term 'gross neglect,' they meant that defendant would be liable for failure to exercise the degree of care that even a careless individual would employ under the circumstances. *Nationwide,* 95 Mich.App. 62, 65, 67, 289 N.W.2d 879 (1980), *lv. denied,* 409 Mich. 854 (1980); *see also, Przeradski v. Rexnord, Inc.,* 119 Mich.App. 500, 507, 326 N.W.2d 541 (1982) (quoting *Nationwide*'s definition for use in a products liability/wrongful death action).

The Michigan Court of Appeals stated that the common law definition of "gross negligence" used with regard to the "last clear chance" doctrine was inapplicable to interpreting the phrase as used in a contract between a landlord and its tenant.[10] *Nationwide,* 95 Mich.App. at 65–66, 289 N.W.2d 879.

RTC, in its response, relies entirely upon its interpretation of Michigan law as erasing the distinction between ordinary and gross negligence. Neither the response nor the complaint allege or provide facts that would allow a jury to conclude that defendants failed to "exercise the degree of care that even a careless individual would employ under the circumstances." Gross negligence, as defined by Michigan courts, has not been shown.[11] Consequently, summary judgment is appropriate as to Count 2.

## CONCLUSION

For the foregoing reasons, RTC's claims in Counts 1, 3, and 4 that defendants' conduct while Peoples Savings Association was a state-chartered financial institution constituted negligence, a breach of their fiduciary duties, and a breach of contract survive summary judgment.

10. *See Zeni v. Anderson,* 397 Mich. 117, 243 N.W.2d 270 (1976) and *Papajesk v. Chesapeake & Ohio R. Co.,* 14 Mich.App. 550, 555, 166 N.W.2d 46 (1968). These cases involve the last clear chance doctrine and a means around the defense of contributory negligence: They do not provide a useful definition of "gross negligence" as a standard of care distinct from "wilful and wanton" that is applicable to the contract interpretation setting. *Nationwide* 95 Mich.App. at 65–66, 289 N.W.2d 879.

11. The definition of gross negligence provided in defendants' brief concerned a last clear chance situation about a means around contributory negligence and appears inapplicable to the pres-

Because section 1821(k) preempts federal common law as to the defendants' actions while Peoples Savings Association was a federally-chartered institution, the claims against defendants are limited to an allegation that their conduct was gross negligence, as defined by state law. Therefore, to the extent that Counts 1, 3, and 4 are claims based upon defendants' actions after Peoples Savings Association became federally-chartered, they are preempted and summary judgment is granted to defendants.

Regarding Count 2, the evidence and allegations are insufficient to establish a claim of gross negligence as defined in Michigan, and summary judgment is granted to defendants.

ent situation, which is more akin to contractual duties. However, it should be noted that defendants' definition is more restrictive than that provided in *Nationwide,* and it has clearly not been met by the proofs or allegations provided by RTC. The definition is as follows:

> Gross negligence may be defined as the intentional failure to perform a manifest duty, in wanton, wilful, or reckless disregard of the consequences, as affecting the life or property of another. It also implies a thoughtless disregard of consequences, without the exercise of any effort to prevent or avoid them.

*Simon v. Detroit United Railway,* 196 Mich. 586, 589, 162 N.W. 1012 (1917).