In re HEALTHCO INTERNATIONAL, INC., Debtor.

William A. BRANDT, Jr., Trustee, Plaintiff,

v.

HICKS, MUSE & CO., INC. et al., Defendants.

Bankruptcy No. 93–41604–JFQ. Adversary No. 95–4154.

United States Bankruptcy Court, D. Massachusetts.

April 9, 1997.

---

J. Joseph Bainton, Ross & Hardies, New York City, for Trustee.

John A.D. Gilmore, Hill & Barlow, Boston, MA, for Airlie Group, L.P., Dort A. Cameron, III, EBD, L.P., Lee M. Bass, Perry Bass, TMT–FW, Inc., Thomas M. Taylor.

Steven M. Pesner, Akin, Gump, Strauss, Hauer & Feld, LLP, New York City, for Akin, Gump, Strauss, Hauer & Feld, Altus Finance, S.A., Lion Advisors, L.P., Apollo Advisors, L.P., Apollo Capital Management, Inc., Apollo Group, L.P., Apollo Investment Fund, L.P., Lion Advisors, L.P., Lion Capital Management, Inc.

Mark N. Parry, Moses & Singer, New York City, for Arthur M. Goldberg, Gemini Partners, L.P.

Jeffrey A. Carter, McKool Smith, P.C., Dallas, TX, for B. Tom Carter, Jr., J. Jerry McCombs, John D. Harkey.

Bar & Karrer, pro se.

Edwin G. Schallert, Debevoise & Plimpton, New York City, for Chancellor Capital Management, Inc., Chancellor Trust Company.

John E. Tener, Robinson & Cole, Boston, MA, for Chrysler Capital Corp.

William J. Hanlon, Goldstein & Manello, P.C., Boston, MA, for Conseco, Inc.

Christian M. Hoffman, Foley, Hoag & Eliot, Boston, MA, for Coopers & Lybrand.

David A. Parke, Bulkley, Richardson & Gelinas, Springfield, MA, for Cramer Rosenthal McGlynn, Inc.

Phillip N. Smith, Jr., McKool Smith, P.C., Dallas, TX, for Davis McCombes Harvey & Carter, HMC Partners, L.P., Healthco Holding Co., Inc., Hicks, Muse & Co., Inc., Hicks, Muse Equity Fund, L.P., Jack D. Furst, John R. Muse, Ray C. Davis, Thomas O. Hicks.

Freshfields, pro se.

David C. Fixler, Rubin and Rudman, Boston, MA, for Helen Cyker, J. Robert Casey, Tr.

Dennis E. Glazer, Davis, Polk & Wardwell, New York City, for J.P. Morgan & Co., Inc.

Hugh J. Gorman, III, Hinckley, Allen, Snyder & Comen, Boston, MA, for Joel Lewin.

Arthur Steinberg, Kaye, Scholer, Fierman, Hays & Handler, New York City, for Kaye, Scholer, Fierman, Hays & Handler.

Vincent M. Amoroso, Parker, Coulter, Daley & White, Boston, MA, for Kenneth W. Aitchison, Robert E. Mulcahy, III.

Arnold P. Messing, Choate, Hall & Stuart, Boston, MA, for Lazard Freres & Co.

William J. Hanlon, Goldstein & Manello, P.C., Boston, MA, for Life Partners Group, Inc., Nat. Fidelity Life Ins. Co.

Darragh K. Kasakoff, Seder & Chandler, Worcester, MA, for Martineau Walker.

Christopher T. Vrountas, Cooke, Clancy & Gruenthal, Boston, MA, for Marvin M. Cyker.

Carl E. Metzger, Testa, Hurwitz & Thibeault, LLP, Boston, MA, for Mercury Asset Management.

James F. Wallack, Goulston & Storrs, Boston, MA, for Morgan Stanley & Co. Incorporated.

Nabarro Nathanson, pro se.

Daniel J. Lyne, Hanify & King, Boston, MA, for Raymond R. Doherty.

Louis A. Goodman, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, for Skadden, Arps, Slate, Meagher & Flom.

Matthew Gluck, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Thomas L. Kempner, Vincent A. Mai.

Kathleen S. Donius, Reinhart, Boerner, Van Deuren, Norris, Milwaukee, WI, for Valuation Research Corporation.

Carl E. Metzger, Testa, Hurwitz & Thibeault, LLP, Boston, MA, for Wand Partners, Inc.

J. Robert Seder, Worcester, MA, for Weil, Gotshal & Manges.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

William A. Brandt, Jr., the chapter 7 trustee (the "Trustee"), has brought this action against virtually everyone who participated in the 1991 leveraged buyout (the "LBO") of the debtor, Healthco International, Inc. ("Healthco"). The initial defendants included selling shareholders, the buyer, financing banks (who have since settled for $10 million), debenture holders, directors, officers, financial advisors, lawyers and accountants. The Trustee asserts the LBO burdened Healthco with obligations under bank loans and subordinated debentures whose proceeds passed to the selling shareholders rather than going to Healthco to help it honor its payment obligations. As a result, it is alleged, Healthco was left insolvent and with unreasonably small capital. The Trustee says this implicates more than fraudulent transfer law. It means the transaction was unfair and injurious to Healthco while profiting the selling stockholders, including Healthco's directors. The Trustee therefore makes claims against the directors for breach of their fiduciary duties of loyalty and care. And he asserts a claim against several parties for aiding and abetting the directors in that breach.

Before the court are motions for summary judgment filed by various defendants, and a motion of the Trustee for partial summary judgment. None of the defendants' motions allege the absence of a genuine issue of material fact on whether the LBO left Healthco insolvent or with unreasonably small capital. They instead contend the Trustee can establish no violation of the directors' duties even if the LBO had such disastrous consequences for the company.

In this opinion, I treat the following motions together because they raise the same or related issues:

(1) Motion of the Trustee for Partial Summary Judgment to Dismiss the Director Defendants' Defense of the Business Judgment Rule;

(2) Motion of Defendants Arthur M. Goldberg and Gemini Partners, L.P. for Summary Judgment on Counts 13, 14 and 20 of the Third Amended Complaint (breach of fiduciary obligations, aiding and abetting that breach and unjust enrichment);

(3) Motion of Hicks, Muse & Co. (Tx) Incorporated, Healthco Holding Corporation, Thomas O. Hicks, John R. Muse, Jack D. Furst and Ray C. Davis (the "Hicks, Muse defendants") for Summary Judgment on Count 13 of the Third Amended Complaint (aiding and abetting);

(4) Motion of Thomas O. Hicks, John R. Muse, Jack D. Furst and Ray C. Davis for Summary Judgment on Count 14 of the Third Amended Complaint (breach of fiduciary duties as directors of HMD Acquisition Corp.);

(5) Motion of Kenneth W. Aitchison and Robert E. Mulcahy, III for Summary Judgment on the claims against them for breach of fiduciary duties as directors of Healthco; and

(6) Motion of Thomas L. Kempner and Vincent A. Mai for Summary Judgment on the claims against them for breach of fiduciary duties as directors and controlling shareholders of Healthco.

## I. SUMMARY JUDGMENT PRINCIPLES

Summary judgment is appropriate when the pleadings, depositions, and affidavits present no genuine issue of material fact, and disclose the moving party is entitled to judgment as a matter of law.[1] Material facts are

---

1. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,* *Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Federal Deposit*

those facts which have the potential of affecting the outcome of the case.[2] Substantive law will determine which facts are material.[3] In ruling on a summary judgment motion, the court must construe the evidence, proffered through documents such as affidavits or discovery responses, in the light most favorable to the party opposing the motion.[4]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[5] Once that burden is met, summary judgment will be granted unless the nonmoving party presents sufficient evidence of a genuine dispute of material fact.[6] The nonmoving party may not successfully resist summary judgment by resting upon "conclusory allegations, improbable inferences, and unsupported speculation."[7] This is particularly so when the nonmoving party asserts a factual dispute on which it would bear the burden of proof at trial.[8] The nonmoving party must proffer evidence which affirmatively tends to prove the dispute in its favor.[9]

## II. FACTS

The affidavits, deposition testimony and other documents filed with the motions and oppositions, or incorporated by reference therein, disclose no disagreement on the essential underlying facts. Prior to its demise, Healthco was a major distributor of dental supplies, equipment and services to providers of dental care throughout the United States, Canada and Western Europe. It was incorporated under the laws of Delaware and had its principal office in Massachusetts. Its capital stock was traded over the counter and quoted on NASDAQ. In calendar 1989, Healthco lost $21.887 million, after a large nonrecurring charge (with a corresponding reserve from surplus) for the cost of restructuring its product distribution system, including such anticipated expenses as lease settlements on closed locations and severance pay for terminated employees.

In 1990, Gemini Partners, L.P. ("Gemini") began acquiring shares of Healthco's outstanding common stock. Gemini is a limited partnership whose executive general partner is ERP Capital Corporation. Emanuel R. Pearlman ("Pearlman") is the director, president and sole stockholder of ERP Capital Corporation. Gemini has three other general partners: AMG Gemini Corp., EWS Gemini Corp. and D & NM Gemini Corp. These corporations are controlled, respectively, by Arthur M. Goldberg ("Goldberg"), Emil W. Solomine ("Solomine") and David M. Mandelbaum ("Mandelbaum"). By May 3, 1990, Gemini owned 9.96% of Healthco's shares. Soon thereafter, it formed a committee, called the Committee for Maximizing Shareholder Value of Healthco International, Inc. (the "Committee"), whose members were Gemini, Pearlman, Goldberg, Solomine and Mandelbaum. The Committee solicited Healthco's stockholders for their proxies and consents for the election of an entire new board of directors. Its nominees for the board were Pearlman, Kenneth W. Aitchison, Bernard J. Hale, John Kenneth Looloian, Robert E. Mulcahy III, Mary Clark Webster and George A. Zurkow.

Gemini entered into a letter agreement with each of the Committee's nominees in which Gemini promised: (i) if Gemini was successful in electing at least a majority of directors and the nominee was elected, to pay the nominee the difference between $24,-

*Insurance Corporation v. Anchor Properties*, 13 F.3d 27, 30 (1st Cir.1994).

2. See *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

3. See *id.*

4. See *Lawton v. State Mut. Life Assurance Co. of Am.*, 101 F.3d 218, 222 (1st Cir.1996); *Anchor Properties*, 13 F.3d at 30.

5. See *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552.

6. See *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

7. *Anchor Properties*, 13 F.3d at 30 (citing *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

8. See *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Federal Deposit Insurance Corp. v. Elder Care Services, Inc.*, 82 F.3d 524, 526 (1st Cir.1996).

9. See *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Lawton* 101 F.3d at 223.

000 and the aggregate director compensation the nominee received during the nominee's first 18 months of service, (ii) if Gemini was successful in electing at least a majority of the board but the nominee was not elected, to pay the nominee $24,000, and (iii) if Gemini did not gain majority board representation but sold its shares of Healthco at a profit, to pay the nominee $24,000 less any director compensation paid the nominee.

Not surprisingly, Healthco's management opposed Gemini's proposal. In June of 1990, Healthco hired as its "exclusive financial advisor" Lazard, Fréres & Co. ("Lazard"), a New York investment banker. Lazard soon proposed that the company be sold. Healthco's board agreed. Appearing soon thereafter was the eventual buyer, Hicks, Muse & Co., Incorporated, now called Hicks, Muse & Co. (Tx) Incorporated ("Hicks, Muse"). Hicks, Muse is a Dallas-based investment banking firm which raises funds from investors for use in leveraged buyouts.

On September 4, 1990, pursuant to board approval, Healthco executed a merger agreement with HMD Acquisition Corp. ("HMD Acquisition"), which Hicks, Muse had organized on August 31, 1990 for the purpose of effecting a leveraged buyout of Healthco. HMD Acquisition was a wholly-owned subsidiary of HMD Holding Co., Inc. ("HMD Holding"), organized by Hicks, Muse on the same day for the same purpose. The merger agreement contemplated the sale or cancellation of all Healthco's outstanding capital stock through a two-step process. HMD Acquisition was first to make a tender offer for the shares at a cash price of $19.25 per share. Next, in the merger of HMD Acquisition into Healthco, shareholders who did not accept the tender offer were to have their stock canceled and be paid $19.25 per share in cash. Consummation of the merger was conditioned upon various events, including Hicks, Muse obtaining financing for the transaction and Healthco's auditors certifying financial statements for the twelve months ending December 29, 1990 which showed earnings before interest, taxes, depreciation and amortization ("EBITDA") of not less than $38 million.

On September 19, 1990, a "Settlement Agreement" was executed among Gemini, Healthco, the Committee, the Committee's nominees, Healthco's seven incumbent directors and seven individuals named in the Settlement Agreement to comprise the new board. In the Settlement Agreement, the parties agreed as follows:

(i) Three members of the incumbent seven-member board would resign.

(ii) Gemini would select three of the Committee's nominees (Messrs. Aitchison, Looloian and Mulcahy) to take their place.

(iii) The new board as so reconstituted would hold a special meeting to nominate its members as directors for re-election at the annual meeting.

(iv) Any future vacancy arising among the four pre-existing directors would be filled by the remaining pre-existing directors.

(v) Any future vacancy arising among the three new directors would be filled by the remaining nominees selected by Gemini.

(vi) The new board would adopt a resolution (a) recognizing the existence of a Special Stockholder Committee (the "Special Committee"), consisting of Gerald C. Cramer and others to be designated by Cramer, (b) authorizing a representative of the Special Committee to be present at all meetings of the board, (c) directing that the Special Committee's representative receive notice of all board meetings, (d) directing Lazard to be available to consult with the Special Committee on the merger, and (e) directing Lazard to inform the Special Committee and the new board members of the terms of any other takeover proposal.

(vii) If the pending merger was terminated in accordance with its terms or not consummated by February 28, 1991 (and by vote of five of seven directors Healthco did not seek an extension beyond that date), and within five business days thereafter the board did not agree to sell the company to another party, the board would be increased to nine members and the additional two positions would be filled by individuals designated by the Special Committee.

(viii) The Debtor would reimburse Gemini for its out-of-pocket expenses incurred in the proxy contest, up to $2,200,000.

(ix) All litigation among the parties, which was considerable, would be terminated and mutual releases exchanged.

The parties complied with their obligations under the Settlement Agreement, and the new board took office.

Healthco's losses continued. On or about March 7, 1991, its auditors, Coopers & Lybrand L.L.P., completed and certified the 1990 financial statements. These statements disclosed that in 1990 Healthco had incurred a net loss of $5.162 million (which included a large nonrecurring charge for costs principally related to the proxy contest) and its 1990 EBITDA was only $21.8 million. The EBITDA figure was far below the $34.4 million which management had predicted for 1990 and which was a condition to the financing committed to Hicks, Muse by a consortium of banks led by Manufacturers Hanover Trust Company. The principal reason for this large discrepancy was that the certified physical inventory value was much less than the inventory figure Healthco carried on its books.

Healthco had been reporting to its shareholders it was making money during each of the first three quarters of calendar 1990. These interim (and unaudited) financial statements were based upon Healthco's use of an accounting method which placed a value upon current inventory through use of estimated gross profit as a percentage of sales. Under this method, Healthco added current purchases, at cost, to the prior year's physical inventory figure. But, according to Coopers & Lybrand, Healthco had no way to accurately compute the cost of any sold item because it maintained no perpetual inventory system tracking the cost of items sold. Instead, it estimated the cost of sold items at approximately 60% of the sales price, resulting in a gross profit of about 40%. As this was merely an estimate, it was subject to inaccuracy caused by such factors as reductions in selling prices and increases in acquisition costs or shrinkage that were not considered at the time of the estimate of the gross profit margin. As a result, the actual value of physical inventory at year end was far less than the value carried on Healthco's books. Healthco's board was aware of these details, at least by mid-March of 1991.

In the weeks before the 1990 financial statements were certified, Healthco's board had received preliminary indications from management that the 1990 EBITDA would be significantly less than the $34.4 million required by the financing banks. At the board meeting of February 20, 1991, Raymond R. Doherty, Healthco's Vice–President and Chief Financial Officer, said he expected the 1990 EBITDA to be approximately $26 million.

The board was given various explanations for the poor 1990 results. Marvin Cyker, Healthco's President and Chief Executive Officer, was recorded as saying at the February 20th meeting "it was difficult, because of [Healthco's] method of determining its inventory, to be sure why the gross profit margin had deteriorated, or when the deterioration had begun, but that he believed it was largely due to discounting and 'give-aways' by branch managers in order to maintain business in the face of uncertainty surrounding Healthco's future, and the opportunity this was presenting to competitors." At other times, however, Mr. Cyker emphasized the need to complete restructuring of the company's distribution system. At the board meeting of February 28th, he stated Healthco needed to "proceed with the restructuring, which had been delayed considerably by the Hicks, Muse transaction, and [Healthco's] prospects generally." At the board meeting of March 20th, Mr. Cyker said "until implementation of the previously approved restructuring plan was recommenced, it would be difficult to improve the bottom-line performance ..."

Efforts to restructure Healthco's distribution system dated back to 1986. In that year, Healthco's board approved a restructuring for the New England region involving the construction of a 120,000 square foot warehouse in Westborough, Massachusetts. The warehouse was designed to triple Healthco's warehousing capabilities in the Northeast and to permit it to consolidate its northeastern branch operations into a single

cluster. Under this cluster concept, Healthco's northeastern branch operations would be reduced and linked by its computer information system to the Westborough facility. The restructuring plan also included relocation of the company's Canadian headquarters, its Canadian warehousing and its Montreal branch operations into a single, new facility in Montreal.

Through 1990, Healthco had established the Westborough facility and cluster, the Montreal cluster and a cluster in Mathews, North Carolina. But none of the clusters had been completed by the end of 1990 because branch locations were continuing to be assimilated into the clusters. In the fourth quarter of 1989, Healthco's board approved a plan to complete and accelerate the restructuring of its domestic and foreign distributions system. During 1990, Healthco was able to put into place only one new warehousing facility. It was also unable in 1990 to proceed with plans to implement a new computer management system, which was part of the restructuring program.

By March 1st, the final 1990 figures were known to Healthco and Hicks, Muse. On that day, Hicks, Muse proposed that the transaction proceed at a reduced price of $15 per share.

On or about March 10th, with the final 1990 figures in hand, Hicks, Muse met with the lead lender, Manufacturers Hanover Trust Company. At that meeting, it submitted its projections of Healthco's profits and cash flow for the next ten years. The "investor scenario" of those projections were in two sets, one more optimistic than the other. The less optimistic projections (called "Case A") had a pretax net profit of $8.977 million in 1991, $26.219 million in 1992, $40.465 million in 1993, and so on. These same projections placed EBITDA at $38.586 million in 1991, $51.910 million in 1992, $61.410 million in 1993, etc. Both sets of projections had the company's net cash flow at zero for the period 1991 through 1993. Both depended heavily upon Healthco rapidly achieving savings in expenses and inventory purchases which Hicks, Muse assumed would materialize through implementation of the restructured

distribution system. Hicks, Muse told the lenders that the company's 1990 problems were the result of a host of factors ranging from "Lack of Senior Management attention to the business" to "No action on known cost reductions," which Hicks, Muse boiled down to: "Bottom line: Healthco has been '[l]eadershipless' in 1990." In contrast to the Hicks, Muse projections, Marvin Cyker, Healthco's CEO, had projected a cash flow deficit of $143,000 in 1991.

At the board meeting of February 8th, Mr. Golub of Lazard was recorded as telling the board "although the deal was tight he believed Hicks, Muse could make it work." Golub, at the same time, told the board he expected to receive additional information on the Hicks, Muse projections. But the board never saw the Hicks, Muse cash flow projections, nor did it ask to see them. The minutes of its meeting of March 26th state: "One of the directors asked a question about the cash flow projections that Hicks, Muse had used to secure its financing commitments. Mr. Golub reviewed the basis of these projections with the directors and noted that they had also been carefully reviewed by the financing sources who were, obviously, comfortable with them."

The minutes of the March 26th meeting contain no explanation of what is meant when the minutes say Golub reviewed the "basis" of the Hicks, Muse projections with the board. Golub's deposition sheds light on this. He discussed with the directors the status of bank commitment on financing rather than the content of the Hicks, Muse cash flow projections. His deposition further indicates nobody at that meeting or any other meeting said that future cash flow would be sufficient to support the company's proposed new debt structure. Lazard considered itself responsible only to issue an opinion that the transaction was "fair, from a financial point of view, to the stockholders." This limited view of Lazard's responsibilities is in contrast to Lazard's broad undertakings contained in the letter agreements under which it was engaged as Healthco's "exclu-

sive financial advisor." [10] Lazard never analyzed the Hicks, Muse cash flow projections. Nor did the board request Lazard to do so.

From the time of the proposed $19.25 sale, the board was aware that Hicks, Muse intended to finance the transaction mostly through debt that would be assumed by Healthco. At its meetings of March 20th and March 26th, the board was furnished with details on financing totaling $247 million. A document prepared by Hicks, Muse for review by the board at its March 26th meeting shows the following:

Source of Funds

| | |
|---|---|
| Senior Bank Term Loan | $45.0 |
| Senior Bank Revolving Loan | $80.0 |
| Assumption of existing debt and capitalized leases | $22.0 |
| Subordinated Debentures | $45.0 |
| Preferred Stock—Series A | $20.0 |
| Preferred Stock—Series B | $ 5.0 |
| Common Stock | $30.0 |
| **TOTAL** | **$247.0** |

Use of Funds

| | |
|---|---|
| Net cash purchase price | $142.0 |
| Existing Debt & Capitalized Leases | 77.0 |
| Professional Fees | 25.0 |
| Additional Cash | 3.0 |
| **TOTAL** | **$247.0** |

Third party corporate investors were purchasing all the $45 million of debentures. An equity fund raised by Hicks, Muse was purchasing most of the $25 million of preferred stock. Hicks, Muse, its equity fund and Ray C. Davis were purchasing all the $30 million of common stock. The financing for sales under the tender offer was to come from the following sources: $50 million of bank loans, $45 million of debentures, and $55 million of stock.

The board knew that an improperly structured leveraged buyout could bring about a company's bankruptcy. And it had been told of potential director liability for approving such a transaction. At the board's meeting of February 8th, company counsel told the board: "[T]he potential liability of a director of a publicly held company in the event of the

company's insolvency has not been established. . . . [H]owever . . . in light of the increasing number of bankruptcies involving highly leveraged transactions, one could expect to see creditors pursuing aggressively every available source of recovery."

By letter dated March 26, 1991, Lazard opined to Healthco's board that the proposed cash consideration of $15 per share to be paid the stockholders "is fair, from a financial point of view, to such stockholders." By then, Looloian had resigned his directorship for health reasons and, through the designation of Gemini's two remaining nominees, had been replaced by Goldberg. On that day, the board approved the transaction by a vote of five to two. Voting for it were Messrs. Goldberg, Mulcahy, Aitchison, and two pre-existing directors, Messrs. Mai and Kempner. Voting against it were the other two pre-existing directors, Messrs. Cyker and Lewin. The resolution adopted by the board stated the board had determined the proposed merger to be "in the best interests of the Company's stockholders." On that same day, Healthco, HMD Acquisition and HMD Holding signed a second merger agreement providing for a cash price of $15 per share. Pearlman was present at the March 26th meeting and a few previous meetings.

On April 2, 1991, HMD Acquisition issued a tender offer to all Healthco shareholders for the purchase of their shares at $15 per share. Holders of over 90% of Healthco's outstanding shares tendered their shares to HMD Acquisition in acceptance of the offer. This was followed by a cash-out merger at the same price which canceled the shares not tendered. Because HMD Acquisition owed over 90% of the shares by April 30th (and because no Healthco shares were being issued under the merger), a shareholder meeting authorizing the merger was unnecessary under Delaware law and was not held.

Shares sold under the tender offer included shares held of record or beneficially by three of the directors voting in favor of the transaction, or by members of their families.

**10.** *See Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.),* 195 B.R. 971, 987 (Bankr. D.Mass.1996).

Gemini, of which Goldberg was a principal, received $11,551,500 for its 9.96% interest. Kempner held 22,475 shares as co-trustee of various trusts. Members of Kempner's family had voting or investment power over 8,750 shares. Another 400 shares were held by Kempner's wife. The total price paid for these Kempner shares was $474,375. Mai owned 12,500 shares outright, which he sold for $187,500. Neither Aitchison nor Mulcahy held shares of Healthco.

The March 26th merger agreement gave Healthco the right to terminate the agreement prior to the effective time of the merger if HMD Holding had not delivered to Healthco a so-called "solvency letter" prepared by an appraisal firm retained by HMD Holding. The solvency letter was to consist of an opinion that after the LBO Healthco would be solvent, in both the bankruptcy and equity sense, and would not be left with unreasonably small capital. Valuation Research Corporation, one of the defendants, was the appraiser retained by HMD Holding for this purpose. On April 30, 1991, the closing date on the tender offer, Valuation Research issued its opinion that as of that date, after giving effect to the changes contemplated by the LBO, Healthco was solvent, in both the bankruptcy and equity sense, and did not have unreasonably small capital. Valuation Research defined not having unreasonably small capital as being a "going concern from an economic perspective." It stated it made no representation as to the sufficiency of this definition "for any purpose other than for setting forth the scope of this opinion." In rendering its opinion, Valuation Research said it assumed Healthco's balance sheet of April 30, 1991 did not differ "significantly" from its December 29, 1990 balance sheet. Valuation Research also assumed that Healthco's liabilities totaled the same amount they totaled on December 29th.

The merger became effective on May 22, 1991, when a certificate of merger was filed with the Secretary of State of Delaware. On that date, Valuation Research issued an updated solvency letter expressing the same opinion, as of that date, as the opinion contained in its April 30th letter. Although by May 22nd Valuation Research knew Healthco

had lost, according to Healthco's own books, $1,987,000 during the first quarter of 1991, its May 22nd opinion makes no mention of this loss. In this second opinion, Valuation Research assumed no significant difference existed between Healthco's balance sheets of March 31st and May 22nd. It attached a valuation balance sheet to each of its solvency letters. Its April 30 balance sheet had Healthco solvent (in the bankruptcy sense) by $30 million (assets of $303 million less liabilities of $273 million). Its May 22nd balance sheet pegged Healthco's solvency at $31 million (assets of $302 million less liabilities of $271 million). The board did not, of course, have these solvency letters available when it approved the LBO on March 26th, nor did it ask for any preliminary opinion.

As agreed in the merger agreement, Hicks, Muse changed Healthco's top management after the LBO. Ray C. Davis, a joint venturer with Hicks, Muse in the LBO, became president and chief executive officer. His business career did not include experience in Healthco's industry. Healthco suffered severe cash shortfalls within a month after the LBO. It sustained a net loss of about $15 million between December 30, 1990 and April 30, 1992. By May of 1992, Healthco was in default under several of its bank loan covenants, including covenants concerning profit and net worth. Hick, Muse replaced Davis with another president in 1992, but operating losses continued. In early June of 1993, the consortium of banks terminated all credit. On June 9, 1993, Healthco filed a petition with this court requesting relief under chapter 11. It was forced to terminate operations when the court declined to approve a proposed borrowing arrangement with a new lender which would have granted the new lender security interests having priority over existing bank debt. The case was a converted to chapter 7 on September 1, 1993.

### III. TRUSTEE'S ABILITY TO ASSERT BREACH OF DUTIES BY DIRECTORS IN AUTHORIZING TRANSACTION LEAVING HEALTHCO INSOLVENT OR WITH UNREASONABLY SMALL CAPITAL

Goldberg and the other former Healthco directors raise two related threshold argu-

ments against the Trustee's ability to recover damages for breach of their fiduciary obligations of care and loyalty. They say the Trustee has no standing to recover for any breach because the Trustee is prosecuting claims held by creditors, which is impermissible under the Bankruptcy Code. And, if the Trustee is viewed as prosecuting a claim that belonged to Healthco and passed to the bankruptcy estate, they assert there is no merit to the claim. This is so, they contend, because their sole obligation in connection with the LBO was to attempt to maximize the consideration passing to Healthco's shareholders, and this they did.

■ It is of course true a trustee in bankruptcy is unable to enforce a claim belonging to a creditor.[11] But the Trustee asserts a claim which belonged to Healthco, not its creditors. The Trustee contends the defendants breached their fiduciary duties *owed to Healthco.* Any Healthco claim is an interest in property which passed to the bankruptcy estate.[12] The Trustee can bring any suit Healthco could have brought, including suits against directors and controlling shareholders for breach of fiduciary duty.[13]

In complaining that directors authorized a transaction which unduly weakened Healthco, the Trustee is not asserting the claim of creditors.[14] He alleges Healthco was the victim of poor management causing damage to the corporation which necessarily resulted in damage to its creditors by diminishing the value of its assets and increasing its liabilities.[15]

■ Nor are the defendants correct in stating their obligations were limited to looking out for the interests of stockholders. Normally, what is good for a corporation's stockholders is good for the corporation. But that was hardly true here if the Trustee establishes the LBO left Healthco insolvent or with unreasonably small capital. When a transaction renders a corporation insolvent, or brings it to the brink of insolvency, the rights of creditors become paramount.[16] In those circumstances, notwithstanding shareholder consent, a representative of the corporation may recover damage from the defaulting directors.[17]

The courts of Delaware, the state of Healthco's incorporation,[18] agree with these

11. *See Caplin v. Marine Midland Grace Trust Co. of New York,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) (trustee unable to pursue claims of debenture holders against debenture trustee).

12. *See* 11 U.S.C. § 541(a)(1) (1994).

13. *See Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991); *Regan v. Vinick & Young (In re Rare Coin Galleries of Am., Inc.),* 862 F.2d 896, 901 (1st Cir.1988); *Koch Refining v. Farmers Union Cent. Exch. Inc.,* 831 F.2d 1339, 1348 (7th Cir.1987), *cert. denied* 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988); *Mixon v. Anderson (In re Ozark Restaurant Equip. Co., Inc.),* 816 F.2d 1222, 1225 (8th Cir.1987), *cert. denied* 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987); *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 508 (N.D.Ill.1988); *Henderson v. Buchanan (In re Western World Funding, Inc.),* 52 B.R. 743, 775 (Bankr.D.Nev. 1985); *aff'd in part and reversed in part on other grounds sub nom., Buchanan v. Henderson,* 131 B.R. 859 (D.Nev.1990), *rev'd on other grounds,* 985 F.2d 1021 (9th Cir.1993).

14. *See Wieboldt Stores,* 94 B.R. at 508.

15. *See Id.*

16. *E.g., Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *McCandless v. Fur-* laud, 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121 (1935); *Clarkson Co. Ltd. v. Shaheen,* 660 F.2d 506 (2d Cir.1981); *Automatic Canteen Co. of Am. v. Wharton,* 358 F.2d 587, 590 (2d Cir.1966); *Davis v. Woolf,* 147 F.2d 629 (4th Cir.1945); *In re Jersey Materials Co.,* 50 F.Supp. 428 (D.N.J. 1943); *New York Credit Men's Adjustment Bureau, Inc. v. Weiss,* 305 N.Y. 1, 110 N.E.2d 397 (1953); 3 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 849 (perm. ed. rev. vol. 1986 & Supp.1991); *The Official Comm. of Unsecured Creditors of Buckhead America Corp. v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.),* 178 B.R. 956, 968 (D.Del.1994).

17. *See McCandless,* 296 U.S. 140, 56 S.Ct. 41; *see also Commodity Futures Trading Comm. v. Weintraub,* 471 U.S. 343, 353, 105 S.Ct. 1986, 1993, 85 L.Ed.2d 372 (1985) (creditors, as well as shareholders, deemed beneficiaries of directors' fiduciary obligations); *Wieboldt Stores,* 94 B.R. at 509–10.

18. The fiduciary duties of a corporation's directors are governed by the law of its state of incorporation. The parties agree on this. *Slattery v. Bower,* 924 F.2d 6, 9 (1st Cir.1991) ("Under Massachusetts law, any question pertaining to the duty owed by the director of a corporation is governed by the law of the state of incorporation").

principles. In *Bovay v. H.M. Byllesby & Co.*,[19] for example, the court held a trustee in bankruptcy stated a cause of action against controlling shareholders in alleging they caused the corporation to distribute funds to them for no consideration and thereby rendered the corporation insolvent. And it has been ruled the directors of an insolvent Delaware corporation breach their fiduciary duties to creditors, even in the absence of formal insolvency proceedings, when they authorize fraudulent conveyances which cause the corporation to be insolvent in fact.[20]

The directors contend there were special circumstances here which imposed upon them the so-called *Revlon* obligation to maximize a distribution to shareholders.[21] The directors' reliance on *Revlon* is misplaced. The *Revlon*, or "auctioneer," duty obliges directors in a situation involving sale of control to accept a higher bid over a less lucrative, but more management-friendly bid.[22] Once *Revlon* duties arise, board action is subjected to enhanced scrutiny.[23] In evaluating the reasonableness of a sale of control, the court "must be mindful of the 'omnipresent spector that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders.'"[24]

The *Revlon* line of cases all involve a board's "disparate treatment of competing bidders."[25] No bidding war was going on for Healthco; Hicks, Muse was the only purchaser on the scene. Gemini had made no offer to purchase. It merely initiated a proxy contest.

Moreover, and most important, the Delaware court did not say in *Revlon*, nor has it said in any other decision, that directors have an obligation to benefit stockholders at the expense of creditors. To the contrary, as we have seen, the Delaware courts recognize that directors breach their fiduciary obligations when they authorize a transaction which prejudices creditors.

Requiring directors to look out for the interests of creditors as well as stockholders involves no irreconcilable conflict, as contended by defendants. It is merely an incident of the fiduciary obligations owed by directors to their corporation. A distribution to stockholders which renders the corporation insolvent, or leaves it with unreasonably small capital, threatens the very existence of the corporation. This is prejudicial to all its constituencies, including creditors, employees, and stockholders retaining an ownership interest. Surely it is not asking too much of directors that they honor their obligations of loyalty and care to avoid the corporation's destruction.

## IV. MEANING OF INSOLVENCY AND UNREASONABLY SMALL CAPITAL

The terms "insolvency" and "unreasonably small capital" require explanation. Insolvency has a settled meaning under fraudulent transfer law, whether the relevant statute be section 548 of the Bankruptcy Code, the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act. Its statutory definition is, in essence, an excess of liabilities over the value of assets.[26] This is sometimes referred to as insolvency in the bankruptcy sense.[27]

The Trustee's claims against the directors are based on principles of fiduciary obligations rather than fraudulent transfer law. Here another form of insolvency is equally relevant—insolvency in the equity sense. This is an inability to pay debts as they

19. 38 A.2d 808 (Del.1944).

20. *See Geyer v. Ingersoll Publications Co.*, 621 A.2d 784 (Del.Ch.1992).

21. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1985).

22. *Id.*

23. *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (Del.1994).

24. *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del.1989).

25. *QVC*, 637 A.2d at 48 ("defensive measures, coupled with the sale of control and subsequent disparate treatment of competing bidders, implicated the judicial scrutiny of Unocal, Revlon, Macmillan, and their progeny").

26. *See, e.g.*, JAMES F. QUEENAN, JR. ET AL., CHAPTER 11 THEORY AND PRACTICE: A GUIDE TO REORGANIZATION § 27.07 (1994).

27. *Id.*

302

mature.[28] Even though not insolvent in the bankruptcy sense, a business is insolvent in the equity sense if its assets lack liquidity.

▮▮▮ The LBO may or may not have rendered Healthco insolvent in either the bankruptcy or equity sense. The core of the Trustee's case appears to lie in his more easily provable allegation that the LBO left Healthco with unreasonably small capital. The meaning of this term, which is undefined in the fraudulent transfer statutes, has been developed by the courts. It connotes a condition of financial debility short of insolvency (in either the bankruptcy or equity sense) but which makes insolvency reasonably foreseeable.[29] In other words, a transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency, not necessarily a likelihood of insolvency. This is similar to the concept of negligence, which is conduct that creates an unreasonable risk of harm to another's person or property.[30] Whether a leveraged buyout leaves a company with unreasonably small capital typically depends upon the reasonableness of the parties' cash flow projections.[31] To be reasonable, the projections must leave some margin for error.[32]

## V. DIRECTORS' OBLIGATION OF LOYALTY—THEIR FINANCIAL INTEREST IN THE LBO

Directors owe their corporation a fiduciary duty of loyalty not to put their personal financial interests above the interests of the corporation.[33] A dispute over violation of this duty often arises when a director has a personal interest in a corporate transaction.[34] Because of his self-interest, the director has the burden of proving the fairness of the transaction, and is not protected by the business judgment rule, discussed later, absent approval of the transaction by a majority of disinterested directors.[35]

The Trustee contends Goldberg, Kempner and Mai became subject to these rules when they sold their shares of Healthco in the LBO, and that the LBO was unfair to Healthco because it left Healthco insolvent or with unreasonably small capital. The directors respond by saying they sold their shares to HMD Acquisition in acceptance of its tender offer and conducted no transaction with Healthco. This is a myopic view of sales under the tender offer. The tender offer sales implicated three parties, not two. Healthco assumed the debt created by the bank loans and debentures whose proceeds constituted the bulk of the purchase price paid to the tendering shareholders. Healthco thus engaged in a transaction which benefited its director stockholders. And Healthco was no mere surety. As the entity who was to survive the merger with HMD Acquisition, Healthco was the only party to whom the banks and debenture holders looked for payment.

---

**28.** *Id.*

**29.** *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir.1992); *Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. 97, 133 (Bankr.D.Mass.1992); *See, e.g.*, Queenan, *supra* note 26, § 27.08 (1994).

**30.** *See* Restatement (Second) of Torts § 282 (1985).

**31.** *See Moody*, 971 F.2d at 1073; *Ferrari*, 148 B.R. at 133; *Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.)*, 195 B.R. 971, 981 (Bankr.D.Mass.1996); *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 404–07 (Bankr.D.Mass.1991);

**32.** *See Moody*, 971 F.2d at 1073; *Brandt*, 195 B.R. at 981; *Ferrari*, 148 B.R. at 133.

**33.** *See Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed.

425 (1920); *Edelman v. Fruehauf Corp.*, 798 F.2d 882, 886 (6th Cir.1986); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361–62 (Del.1993); *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1264, 1279–80 (Del.1989); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984); *Pogostin v. Rice*, 480 A.2d 619, 623–24 (Del.1984); *Lewis v. Fuqua*, 502 A.2d 962 (Del.Ch.1985); 3 Fletcher, *supra* note 16, §§ 191, 1009; Ernest L. Folk III, et al., Folk on Delaware General Corporation Law: A Commentary and Analysis § 141.2.1 (3d ed. 1992).

**34.** *See Geddes*, 254 U.S. at 599, 41 S.Ct. at 212; *Edelman*, 798 F.2d at 886; *Cede*, 634 A.2d at 361–62; *Macmillan*, 559 A.2d at 1264, 1279–80; *Aronson* 473 A.2d at 812; *Pogostin*, 480 A.2d at 623–24; *Fuqua*, 502 A.2d 962; 3 Fletcher, *supra* note 16, §§ 919, 1009; Folk *supra* note 33, § 141.2.1.

**35.** *Id.*; Del.Code Ann. tit. 8 § 144 (1996).

It is said stock ownership by a director is not a conflict of interest. Corporations encourage it so as to have a board whose personal interests are aligned with those of the stockholders, the corporation's prime constituency. That is undoubtedly true as a general proposition. But it does not change the fact these directors had a personal interest in a corporate transaction when Healthco agreed to repay the loans whose proceeds went to the directors.

The question is whether the directors had a financial interest in the LBO which was sufficiently material to place upon them the burden of proving the transaction was fair to Healthco, and to deprive them of the business judgment rule. The Delaware courts have developed a test for materiality. It is essentially this: Would the independence of judgment of a reasonable person in the director's position be affected by the financial interest in question? [36] This requires consideration of all the facts bearing on the significance or magnitude of the director's financial interest.[37]

■ Goldberg's financial interest was clearly material. This is so not only because Gemini had a 9.96% stock interest which was sold for $11,551,500, 25% of which went to Goldberg. Equally significant is the fact Goldberg was placed on the board for the sole purpose of selling Gemini's shares at a profit. This is obvious from the terms of the settlement agreement of September 19, 1990. Gemini was given the right to name five of nine directors if the pending Hicks, Muse merger did not take place by February 28, 1991 and within five days thereafter the board did not decide to sell to another party. Gemini's driving motivation to sell its shares is also manifest in the agreements Gemini made with its director nominees, Aitchison and Mulcahy. Gemini agreed to pay each of these nominees $24,000 (less the nominee's compensation as director) if its shares were sold at a profit. Subject to the question of independent board approval, discussed below, this places upon Goldberg the burden of establishing the LBO did not leave Healthco

insolvent (in the bankruptcy or equity sense) or with unreasonably small capital.

■ The evidence is not as compelling on the materiality of the financial interests of Kempner or Mai. The amount received by each of them or their trusts or relatives ($474,375 for Kempner and $187,500 for Mai) was fairly considerable. But there is no information on their financial circumstances or the financial interests of the Kempner trust beneficiaries and family members. The materiality of these financial interests should be determined by the jury. If the jury finds them material, Kempner and Mai will have the burden of proving the LBO's fairness to the corporation, and Kempner and Mai will be without protection of the business judgment rule.

■ Neither Aitchison nor Mulcahy owned Healthco stock. Under their agreement with Gemini, their financial interest in the transaction consisted of $24,000, less the amount of their director fees. This may well be found to be an immaterial financial interest. A director's obligation of loyalty to his corporation is not, however, limited to subordinating his own financial interests to those of the corporation. It necessarily encompasses a duty not to place another director's financial interest above the interests of the corporation. The very reason Aitchison and Mulcahy were on this board was to sell Gemini's shares. This is the real significance of their agreement with Gemini, not the $24,000. It is also significant that in selecting a replacement for Looloian they chose Goldberg. They are tainted with Gemini's driving motivation to sell its shares. As a result, they as well as Goldberg have the burden of proving the fairness of the LBO, without the protection of the business judgment rule.

Delaware law protects a transaction between a corporation and one or more of its directors, regardless of the transaction's fairness to the corporation, if the director's financial interest is disclosed and the transaction is approved by vote of a majority of disinterested directors. Section 144 of the Delaware corporation law reads as follows:

---

**36.** *See Cede,* 634 A.2d at 360–62.

**37.** *Rothenberg v. Santa Fe Pacific Corp.,* 1995 WL 523599, at *5 (Del.Ch. Sept. 5, 1995).

(a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee or the shareholders.

(b) Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction.[38]

Section 144 speaks only of preventing avoidance of a transaction. It says nothing about protecting a director from a damage suit. But presumably the Delaware courts would be guided by it in a damage suit such as the one now before the court.[39]

With Goldberg, Aitchison and Mulcahy all imbued with Gemini's financial interest, it makes no difference whether or not Kempner and Mai are disinterested directors. Even if they are, their affirmative votes are matched by the negative votes of Cyker and Lewin, who would presumably also be considered disinterested if Kempner and Mai are so considered. This would prevent majority approval by disinterested directors. The disinterestedness of Kempner and Mai could become relevant if Aitchison and Mulcahy are viewed as disinterested by reason of their lack of stock ownership, notwithstanding their affiliation with Gemini and Goldberg.

Obviously, Kempner and Mai fail to qualify as disinterested if they are found to have had a material financial interest in the transaction. The Delaware courts require less than a material financial interest, however, if the question is whether the director is disinterested for the purpose of approving the corporation's transaction with another director. The Supreme Court of Delaware has said: "We have generally defined a director as being independent only when the director's decision is based entirely on the corporate merit of the transaction and is not influenced by personal or extraneous considerations."[40] The court there reversed the trial court in its ruling requiring a director's self interest to infect the rest of the board for the director's interest to be considered material. In *Mills Acquisition Co. v. Macmillan, Inc.*,[41] the court refused to characterize as "independent" a special committee of directors which was hand picked by management board members promoting their own leveraged buyout in competition with the bid of a third party. And in *Lewis v. Fuqua*,86100999[42] the court recognized that intangibles can destroy independence. A stockholder had brought a derivative action against directors for allegedly usurping a corporate opportunity. The board appointed a director as a one-person litigation "committee" to look into the merits of the suit. Pursuant to the recommendation of that director, who had not par-

---

38. Del.Code Ann. tit. 8. § 144 (1996).

39. *See Cede,* 634 A.2d at 365.

40. *See Id.* at 362.

41. 559 A.2d at 1267.

42. 502 A.2d 962 (Del.Ch.1985).

ticipated in the purchase in question, the board voted to dismiss the suit. Emphasizing the directors's political and financial dealings with management, the court ruled the corporation had not sustained its burden of showing independence.

■ Kempner and Mai may or may not have had a sufficiently material financial interest in the LBO to be burdened with proving the transaction's fairness. The jury will determine that. I conclude their stock interests are easily sufficient under Delaware law to deprive them of the ability to cast disinterested affirmative votes having the effect of protecting Goldberg, Aitchison and Mulcahy.

The defendants rely upon general language in some Delaware decisions concerning benefits which are permitted to directors. For example, in *Aronson v. Lewis*,[43] the court said: "[D]irectors can neither appear on both sides of a transaction nor expect to derive a benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." And in *Pogostin v. Rice*,[44] the court said: "Directorial interests exists whenever divided loyalties are present, or a director has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders."

The defendants say these statements mean a director cannot be held responsible for breach of his fiduciary obligations in a stock transaction if he gets no more per share for his stock than did other stockholders. This is an overly expansive reading of the decisions, which did not involve stock transactions by directors. The court was merely recognizing there is nothing wrong with a director deriving benefit from his stock which is of the same type of benefit derived by other stockholders. There is indeed nothing wrong, *per se*, with a director selling his stock in the corporation, even when the transaction involves the corporation and even

though other stockholders do not join in, just as there is nothing necessarily wrong with a director selling any property to his corporation. But the director must establish the fairness of the transaction in all instances.

In summary, Goldberg, Aitchison and Mulcahy all bear the burden of proving the LBO did not leave Healthco insolvent (in either the bankruptcy or equity sense) or with unreasonably small capital. In bearing this burden, they do not have the benefit of the business judgment rule. If they fail to sustain their burden, they are responsible for the resulting damages incurred by Healthco and derivatively by its creditors. The same is true of Kempner or Mai if either is found to have had a material financial interest in the LBO by reason of the Healthco stock owned of record or beneficially by him or members of his family.

## VI. DIRECTORS' OBLIGATION OF CARE—THE BUSINESS JUDGMENT RULE

Directors of a corporation owe the corporation a duty of care as well as loyalty.[45] "The duty of care includes a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them."[46] "The more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives. For example, when the decision is to sell the company or to engage in a recapitalization that will change control of the firm, the gravity of the transaction places a special burden on the directors to make sure they have a basis for an informed view."[47] "While a board of directors may rely in good faith upon 'information, opinions, reports or statements presented' by corporate officers, employees and experts 'selected with reasonable care,' 8 Del.C. § 141(e), it may not avoid its active and direct duty of oversight in a

43. 473 A.2d 805, 812 (Del.1984).

44. 480 A.2d 619, 624 (Del.1984).

45. *E.g., Polk v. Good*, 507 A.2d 531, 536 (Del. 1986); *Smith v. Van Gorkom*, 488 A.2d 858, 872–74 (Del.1985); FOLK, *supra* note 33, § 141.2.1.

46. FOLK, *supra* note 33, § 141.2.1.

47. *Id.*

matter as significant as the sale of corporate control." [48]

A director's obligation of care is somewhat muted by the business judgment rule. The rule is subject to various formulations. The Supreme Court of Delaware has recognized it as "a presumption that in making a business decision the director of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." [49] The court has also phrased the rule in terms of gross negligence: "While the Delaware cases use a variety of terms to describe the applicable standard of care, our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence." [50] And the court has said: "We think the concept of gross negligence is also the proper standard for determining whether a business judgment reached by a board of directors was an informed one." [51]

The protection afforded a director by the business judgment rule has its limitations:

First, its protections can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment. From the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.... Thus, if such director interest is present, and the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application.... *See* 8 Del.C. § 144(a)(1).

Second, to invoke the rule's protection, directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties. [52]

As indicated in part V, none of Goldberg, Aitchison or Mulcahy has the protection of the business judgment rule, and each bears the burden of proving the LBO was fair to Healthco. This is also so as to Kempner or Mai if the jury finds either had a material financial interest in the LBO.

■ If Kempner or Mai is found not to have had a material financial interest in the LBO, does he have the protection of the business judgment rule? I think not, for two reasons. First, to the extent the rule constitutes a presumption, it presumes directors act believing "the action taken was in the best interests of the company." [53] This presumption is rebutted by the resolution which the directors adopted at the board's March 26th meeting. The resolution states the board had determined the merger was "in the best interests of the Company's stockholders." The resolution makes no mention of Healthco. This was not a mere drafting error of counsel. A review of the minutes of that meeting and others demonstrates the board was concerned only with the interests of stockholders.

Second, the directors did not fulfill their "duty to inform themselves, prior to making [the] business decision, of all material information reasonably available to them." [54] The most critical information concerning the LBO's effect upon Healthco consisted of the cash flow projections prepared by Hicks, Muse on March 10th. The directors were aware of the existence of those projections and yet never asked to see them. It is surely no excuse they were told the projections satisfied the banks. The directors had independent fiduciary obligations. Moreover, being secured, the lenders might well be more easily satisfied than a fiduciary

**48.** *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1281 (Del.1989).

**49.** *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

**50.** *Id.*

**51.** *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del.1985).

**52.** *Aronson*, 473 A.2d at 812.

**53.** *Id.* at 811.

**54.** *Id.* at 812.

charged with responsibility to Healthco and all its constituencies, including employees and unsecured creditors. Nor did the directors ask for or receive an analysis of the projections from Lazard, their exclusive financial advisor. I infer from the evidence that Lazard never saw the projections. It is clear from the Golub deposition, in any event, that Lazard presented no analysis of the Hicks, Muse projections to the board. Lazard's fee arrangement placed it in a conflict of interest in this regard. Most of Lazard's fee was computed as a percentage of the sales price.

The obligation of all the directors, therefore, was one of ordinary care. There is ample evidence warranting a finding they were negligent. They had many warning signs of the coming disaster. At the time of the March 26th vote, they knew: (i) the results of the 1990 operations; (ii) the likelihood of further losses in the first quarter of 1991; (iii) the perceived need for the company to complete the restructuring of its distribution system if it was ever to achieve profitability; (iv) the lack of results from the restructuring that had taken place to date; (v) the leveraged nature of the sale; (vi) the existence of cash flow projections by Hicks, Muse; and (vii) the lack of experience in the industry of the new president, Ray C. Davis. Yet, the directors never asked to review the Hicks, Muse projections or even for an analysis of them by their financial advisor, Lazard.

An impartial review of the Hicks, Muse projections by directors familiar with the company would likely have resulted in the board withholding its approval of the LBO. The projections lacked reality. Their assumption that immediate savings would be achieved from the distribution restructuring was clearly too optimistic in light of the fact the restructuring had been going on for years without completion or demonstrable results. And perhaps most significant, the projections left no margin for error. Hicks, Muse was largely playing with other people's money. This is unlikely to promote conser-

vatism. The directors should have known that.

The defendants say they relied on the solvency opinions of Valuation Research Corporation. But they never saw those opinions before approving the transaction, so the opinions can hardly constitute "reports" of an expert the directors were entitled to rely upon under section 141(e) of Delaware's corporation law. The defendants respond by saying they were assured the transaction would not go through if Valuation Research failed to issue a favorable opinion. In a transaction of this significance, however, directors are not permitted to avoid an "active and direct duty of oversight." [55] Moreover, reliance upon an expert is permitted only if the expert is "selected with reasonable care by or on behalf of the corporation." [56] Valuation Research was selected and retained by Hicks, Muse. Its solvency opinions were influenced by the deficiencies of the Hicks, Muse cash flow projections, which Valuation Research had examined. And its opinions had their own deficiencies. The April 30th opinion, for example, fails to mention, much less discuss, Healthco's known loss of $1,987,-000 incurred during the first quarter of 1991. Even worse, despite this known loss, the April 30th opinion assumes that the company's balance sheets of December 29th and April 30th do not "differ significantly." Without a physical inventory being taken on March 31, 1991, moreover, this loss was presumably understated in light of the inadequacy of Healthco's inventory system, which was known to all.

The result is the same even if the directors are given the benefit of the business judgment rule so that they have a duty of slight care and are responsible only for gross negligence. The evidence warrants a finding of gross negligence.

## VII. LACK OF RES JUDICATA EFFECT OF STEINER SUIT

The former directors of Healthco contend they are protected by principles of *res judicata*. In 1991, an action was brought

---

**55.** *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1281 (Del.1989).

**56.** Del.Code Ann. tit. 8, § 141(e) (1996).

against them in the Delaware Chancery Court entitled *Steiner v. Healthco International, Inc.*, Case No. 11991. The plaintiff, a shareholder whose stock had been cashed out in the merger, brought the suit as a class action on behalf of all other such shareholders. On July 31, 1991, an order and final judgment was entered dismissing the suit on the merits, with prejudice. The judgment dismissing the suit included dismissal of "any claims that have been or could have been asserted arising from the facts alleged in the complaint. . . ."

The *Steiner* judgment does not protect the defendants from the claims asserted here. The plaintiff in *Steiner* was asserting a claim held by the shareholders rather than by Healthco. His complaint was the shareholders were paid too little. The Trustee is prosecuting a cause of action held by Healthco which passed to the bankruptcy estate. The Trustee complains the LBO was unfair and injurious *to Healthco,* however beneficial it may have been to the selling shareholders. If he is successful in collecting damages, creditors rather than present stockholders will benefit because creditors have first claim on the assets of the bankruptcy estate. And it makes no sense to say the Trustee stands in privity to the class action plaintiffs in *Steiner.* The Trustee has included as defen-

dants in the present suit those very stockholders, seeking to avoid the payments made to them on the grounds they were fraudulent transfers. In *Steiner,* furthermore, Healthco was a true co-defendant, not a nominal defendant in a stockholder derivative action brought for the benefit of the corporation.

## VIII. DELAWARE'S EXEMPTION OF DIRECTORS FROM LIABILITY FOR BREACH OF DUTY OF CARE

 1. Apparently in reaction to the decision in *Smith v. Van Gorkom* [57] the Delaware legislature in 1986 inserted into its corporate law section 102(b)(7), set forth below.[58] Healthco soon took advantage of the new law. In 1988, it amended its certificate of incorporation to add the permissible charter provision.[59]

The defendant directors are therefore immune from liability for breach of their duty of care.[60] But, in accordance with section 102(b)(7), they remain accountable for violation of their obligation of loyalty.

The statute's exemption from liability for lack of care extends only to directors. Section 102(b)(7) purports to grant no protection to third parties who aid and abet directors in

---

**57.** 488 A.2d 858 (Del.1985).

**58.** Section 102(b)(7) permits a corporate charter to include:

> (7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) for any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective.

DEL.CODE ANN. tit 8, § 102(b)(7) (1996).

**59.** This provision in Healthco's certificate of incorporation reads as follows:

> EIGHTH 1. No director shall be personally liable to the Corporation or its stockholders

for monetary damages for any breach of fiduciary duty by such director as a director, except (i) for any breach of the director's duty of loyalty to the corporation or its stockholders (ii) for acts of omissions not in good faith or which involve intentional misconduct or a knowing violation of law (iii) pursuant to Section 174 of Title 8 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit.

> 2. Any repeal or modification of this Article EIGHTH shall not increase the personal liability of any director for any act or occurrence taking place prior to such repeal or modification, or otherwise adversely affect any right or benefit of a director existing at the time of such repeal or modification.

> 3. The provisions of this Article EIGHTH shall not be deemed to limit or preclude indemnification of a director by the corporation for any liability which has not been limited by the provisions of this Article EIGHTH.

**60.** *See, e.g., Zirn v. VLI Corp.,* 681 A.2d 1050 (Del.1996); *Arnold v. Society for Sav. Bancorp, Inc.,* 650 A.2d 1270 (Del.1994).

the violation of their obligations of either care or loyalty. I now turn to that subject.

## IX. AIDING AND ABETTING CLAIMS

The Trustee asserts claims against Gemini and the Hicks, Muse defendants for aiding and abetting Healthco's directors in the breach of their fiduciary obligations of loyalty and care. Because this is a tort claim, presumably it is governed by the law of the state where the conduct took place, which is apparently not Delaware. In any event, Delaware recognizes a cause of action for aiding and abetting another in the other's breach of fiduciary duties.[61] The elements of an aiding and abetting claim are: (1) existence of a fiduciary relationship, (2) breach of the fiduciary's duty, and (3) knowing participation in that breach by the nonfiduciary defendants.[62] To defeat a motion to dismiss, a plaintiff must plead specific facts showing the defendant knowingly participated in a fiduciary's breach; a conclusionary statement to that effect is not enough.[63]

In *Fry v. Trump*,[64] the court denied a motion to dismiss an aiding and abetting claim against Donald Trump when: (i) the directors paid Trump a premium to buy Trump's stock in the corporation, and (ii) Trump and the directors executed a "standstill agreement" obligating Trump not to take action to remove the directors for a specified length of time. These facts, the court concluded, evidenced Trump's knowing participation in the directors' attempt to entrench themselves.

■ As was the case in *Fry v. Trump*, there is ample indication here of knowing participation by Gemini in the directors' breach of their fiduciary obligations. Gemini placed three on the board with the mandate to sell its stock. Gemini, in the person of Pearlman, attended several board meetings. Gemini urged the board on at every step.

Through Goldberg and Pearlman, Gemini knew all the essential details of the proposed transaction. That is sufficient to make its participation "knowing." Gemini would apparently have the court require it to be presented with a legal opinion prior to the LBO stating a board vote approving the transaction would constitute breach of the directors' fiduciary obligations. Such a requirement, obviously, would emasculate the cause of action of aiding and abetting.

■ The Hicks, Muse defendants were also knowing participants. They were the architects of the entire transaction. The financing was based on the Hicks, Muse cash flow projections. Hicks, Muse had the same warning signs that should have alerted the board. Hicks, Muse knew the board had not analyzed its projections. Yet it proceeded with the transaction when it knew the risks.

■ The Hicks, Muse defendants contend they are protected by a clause in the March 26, 1991 merger agreement. Section 9.9 of the merger agreement provides:

9.9 *No Recourse.* Notwithstanding any of the terms or provisions of the Agreement, [Healthco] agrees that neither it nor any person acting on its behalf may assert any claims or cause of action against any officer or director of [HMD Acquisition] or [HMD Holding] or any stockholder of [HMD Holding] in connection with or arising out of this Agreement or the transactions contemplated hereby.

This clause gives the Hicks, Muse defendants no protection against the Trustee's aiding and abetting claims. In barring claims against officers and directors of HMD Acquisition or HMD Holding, and against stockholders of HMD Holding, the clause's natural interpretation is that it protects such parties from liability for actions taken in their capacity as such an officer, director or stockholder. For example, Hicks, Muse, as a stockholder

**61.** *E.g., Solash v. Telex Corp.*, 1988 WL 3587, at *12 (Del.Ch. Jan. 14, 1988). ("[I]t is well established that one who knowingly participates with a fiduciary in a breach of trust renders himself liable to the injured beneficiary.")

**62.** *See In re Santa Fe Pac. Corp. Shareholder Litigation*, 669 A.2d 59, 72 (Del.1995); *Greenfield v. Tele–Communications, Inc.*, 1989 WL 48738, at

*2, 1989 LEXIS 49, at *5–6 (Del.Ch. Nov. 9, 1989).

**63.** *See Santa Fe*, 669 A.2d at 72; *Solash*, 1988 WL 3587, at *12.

**64.** 681 F.Supp. 252 (D.N.J.1988).

of HMD Holding, is protected from any claim that it is an alter ego of HMD Holding, and hence liable for the obligations of HMD Holding, because it failed to keep separate records for HMD Holding. The Trustee asserts no alter ego claim seeking to hold Hicks, Muse liable for the obligations of HMD Holding. The Trustee's aiding and abetting claim is brought against Hicks, Muse based on Hicks, Muse's actions in being the architect of the LBO. Similarly, the Trustee's aiding and abetting claim is not brought against the individual Hicks, Muse defendants for actions taken in their capacity as officers or directors of HMD Acquisition or HMD Holding. It is based upon actions taken in their capacity as principals of Hicks, Muse and, in the case of Ray C. Davis, as a joint venturer with Hicks, Muse in the Healthco purchase. The Trustee contends that they, jointly with Hicks, Muse, aided and abetted the directors in breaching their fiduciary obligations.

There is an additional difficulty with the interpretation of section 9.9 urged by the Hicks, Muse defendants. In approving execution of the merger agreement, the directors of Healthco had neither real nor apparent authority to release claims related to breach of their fiduciary duties.

## X. DAMAGES

▮ Goldberg and Gemini contend the Trustee has presented no evidence of damages, observing that the Trustee's deposition testimony and the testimony and reports of his experts do not contain a dollar estimate of damages. The Trustee's burden, however, is to provide a factual basis for the jury to compute damages under the measure of damages governing his claims.

The measure of damages governing the Trustee's claims for breach of fiduciary duties and aiding and abetting that breach is the amount of decrease in the fair market value of Healthco that resulted from the defendants' actions.[65] Based upon this measure of damage, the Trustee must prove: (a)

the value of Healthco at the time of the tortious conduct, (b) its decreased value resulting from the tortious conduct, and (c) that the tortious conduct was a significant contributing cause of the decrease. The Trustee's experts have testified in their depositions that prior to the LBO the value of Healthco's assets was about $300 million. When Healthco failed, the liquidation of its assets yielded net proceeds of under $60 million. The Trustee's experts have also testified that the debts incurred by Healthco in the LBO were a substantial cause of Healthco's failure. The Trustee has, therefore, offered evidence of damages caused by the LBO of about $240 million. Creditors have filed proofs of claim totaling well over that amount.

The defendants contend the measure of damages is limited to any decrease in Healthco's value immediately after the LBO, not two years later. This is like saying of an accident which caused gradual health deterioration in the plaintiff that damages are limited to the plaintiff's state of health immediately after the accident.

## XI. OTHER ISSUES

Count 14 of the Third Amended Complaint asserts a claim against the individual Hicks, Muse defendants for breach of their fiduciary duties as directors of HMD Acquisition. They owed those duties, however, to HMD Acquisition, not to Healthco. The Trustee's case is not aided by the fact these individuals also served as directors of Healthco beginning April 30, 1991, when the tender offer closed. Healthco had already committed itself to the transaction through its prior board. This count should be dismissed.

▮ Count 20 of the Third Amended Complaint asserts an unjust enrichment claim against Goldberg and Gemini for having received the sales proceeds from the sale of Gemini's stock. A claim for unjust enrichment is appropriate when there is (i) receipt of a benefit; (ii) resulting detriment to the other party, and (iii) circumstances which

---

65. *See* Administrative Office of the District Court, Commonwealth of Massachusetts, *Model Jury Instructions for Use in the District Court*, Instruction 7.04, at 5 (1995); *Kenney v. Rust*, 17 Mass.

App.Ct. 699, 462 N.E.2d 333, *rev. denied*, 391 Mass. 1106, 464 N.E.2d 73 (1984) (measure of damages in negligence case is the fair market value of the property destroyed).

make retaining the benefit unjust.[66] A claim for unjust enrichment exists against a fiduciary for breach of fiduciary duty,[67] and against a third party who "colludes with the fiduciary or knowingly obtains a benefit from the breach."[68] If it is determined by the jury that Goldberg breached his fiduciary obligation of loyalty, and that Gemini aided and abetted that breach, retention of any portion of the sales proceeds by either would be unjust. Count 20 will not be dismissed.

█ I will dismiss the claims against Kempner and Mai for breach of their fiduciary obligations as controlling shareholders. They held far less than a majority stock interest and the Trustee has produced nothing indicating they exercised actual control over the board.[69]

Separate orders have issued in accordance with this opinion. Although these orders all pertain to non-core, related claims, they do not constitute proposed conclusions of law under section 157(c)(1) of title 28. This is because by filing their summary judgment motions here and requesting dispositions of them by this court the defendants have consented to the court adjudicating the motions. A bankruptcy judge may hear and determine a related proceeding with the consent of the parties.[70]

66. See Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.), 195 B.R. 971, 989–90 (Bankr. D.Mass.1996).

67. See Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 677 N.E.2d 159, 194 (1997).

68. Branch v. Federal Deposit Insurance Corp., 825 F.Supp. 384, 411 (D.Mass.1993.).

69. See Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.), 203 B.R. 515, 518–20 (Bankr.D.Mass.1996).

70. 28 U.S.C. § 157(c)(2) (1994); Commodity Futures Trading Commission v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986).